[Cite as *In re J.C-A.*, 2020-Ohio-5336.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE J.C-A., ET AL.

A Minor Child

[Appeal by L.C., Mother]

:
:
:
:
:
:

No. 109480

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** November 19, 2020

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD-17916937, AD-17916938, AD-17916939, AD-17916940, and AD-17916941

---

### *Appearances:*

Valore & Gordillo, L.L.P., and Dean M. Valore, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee.*

MARY J. BOYLE, P.J.:

{¶ 1} Appellant, L.C. ("mother"), appeals the juvenile court's judgments granting permanent custody of four of her five children, A.W. (d.o.b. August 27, 2008), K.E.D. (d.o.b. November 5, 2012), K.D. (d.o.b. November 5, 2012), and J.C-

A. (d.o.b. August 28, 2014), to appellee, Cuyahoga County Department of Children and Family Services ("CCDCFS" or "the agency").[1]  Mother raises one assignment of error for our review:

> The trial court's award of permanent custody and termination of the appellant's parental rights is against the manifest weight of the evidence.

{¶ 2} Finding no merit to mother's appeal, we affirm.

## I. Procedural History and Factual Background

{¶ 3} On November 8, 2017, the juvenile court granted CCDCFS emergency, predispositional temporary custody of the children after mother called CCDCFS's hotline and said that she wanted the agency to "come and pick up her children" and that "if someone didn't come and remove them right away," she would harm them.  When CCDCFS social workers went to mother's house, they learned that mother had been drinking and was "irate" and "very angry."  She told the agency workers that "she was overwhelmed and that she needed help."  According to CCDCFS, mother admitted that she had not been "receiving any mental health treatment" at that time even though she had been diagnosed with bipolar disorder, depression, anxiety, and posttraumatic stress disorder.  Mother also admitted that there was "marijuana use in the home."

{¶ 4} CCDCFS simultaneously filed a complaint alleging that the children were neglected and dependent, and requesting temporary custody of them.  In

---

[1] Mother does not appeal the juvenile court's judgment with respect to her fifth child, D.C.S. (d.o.b. October 18, 2005).  The juvenile court awarded D.C.S.'s father legal custody of him.

addition to the reasons for removal, CCDCFS stated in the complaint that the children were previously removed from mother's care in November 2015 and adjudicated neglected and dependent. The children were returned to mother's legal custody with protective supervision from July to December 2016, when protective supervision was terminated.

{¶ 5} The complaint further alleged that mother was currently on probation for forging identification cards and has criminal convictions for endangering her children.[2] According to the complaint, mother had previously been diagnosed with bipolar disorder, depression, posttraumatic stress disorder, and anxiety, and had not been taking her medication. CCDCFS further alleged that mother had a substance abuse problem, specifically marijuana and alcohol, which prevented her from providing appropriate care for her children. The complaint also alleged that although mother had engaged in parenting classes, anger management, and mental health services in the past, she had not benefited from the provided services.

{¶ 6} CCDCFS placed K.E.D. and K.D. (collectively "the twins") with D.D., paternal grandmother, and placed the other three children, D.C.S., A.W., and

---

[2] In 2016, mother was convicted of three counts of endangering her children under R.C. 2919.22(A), first-degree misdemeanors. *See* C.P. No. 598336. In 2008, mother was also convicted of arson, endangering children, and domestic violence, all first-degree misdemeanors. *See* C.P. No. 514336. It is unclear who the victims were in her 2008 case.

J.C- A., with C.D., paternal aunt. [3] CCDCFS placed the children with these same caregivers in the 2015 case that had closed in December 2016.

{¶ 7} The juvenile court appointed a guardian ad litem ("GAL") for the children. CCDCFS created a case plan for mother with the goal of reunification. According to mother's case plan, she was supposed to complete an updated mental health assessment and psychological evaluation, participate in all recommended treatment and take all recommended medication, seek and obtain gainful employment, actively participate in and complete a parenting program and be able to demonstrate what she learned during interactions with her children, actively participate in, attend all classes, and complete an approved anger management program, participate in and complete an approved alcohol and drug treatment program as well as an approved aftercare program, and demonstrate sobriety "for a period of no less than six months."

{¶ 8} In March 2018, mother admitted to the allegations in an amended complaint, and the juvenile court adjudicated the children neglected and dependent. The court granted CCDCFS temporary custody of them approximately one week later.

{¶ 9} On March 29, 2019, CCDCFS moved to modify temporary custody to legal custody. Specifically, CCDCFS requested that legal custody of K.E.D. and K.D. be granted to their paternal grandmother and legal custody of J.C-A., A.W., and

---

[3] Although CCDCFS states that the second caregiver is "paternal aunt," she is only the paternal aunt to the twins. The three children who were placed with her, D.C.S., A.W., and J.C-A., are not related to her by blood.

D.C.S. be granted to their "paternal aunt/interested individual." On May 30, 2019, CCDCFS amended its motion to request permanent custody of all five children.

{¶ 10} The GAL filed his final report on October 21, 2019. In it, he stated that in the previous custody case, he "reluctantly recommend[ed] that the children be placed in the legal custody of their mother with CCDCFS having protective supervision." In this case, the GAL stated:

> Mother needs to complete substance abuse counseling, obtain appropriate housing, and mental health counseling. Mother reports that she has completed all of these services. CCDCFS indicates that they have been unable to verify that mother has completed these services. Without knowing if the mother has successfully completed these services, it is impossible to make an effective recommendation.

{¶ 11} The GAL further explained that mother "has been inconsistent in taking her medication." In the past, this has caused her to make poor parenting decisions, such as leaving the children home alone, domestic violence with their fathers, and threatening to harm herself and the children. The GAL stated that if "mother does not effectively address her mental health, it is likely that she will continue to make poor decisions."

{¶ 12} The GAL reported that D.C.S. had been having overnight visits with his father, which were going well. Therefore, the GAL recommended that D.C.S. be placed in the legal custody of his father.

{¶ 13} The GAL concluded that permanent custody should be granted "if the evidence shows that mother has not successfully completed drug treatment, her mental health counselors indicate that she has not been complying with their

recommendations for six months or mother has not been sober for six months." But "if the evidence shows mother has met those above conditions," he recommended that permanent custody be denied "and visits should begin in mother's home."

{¶ 14} The juvenile court held hearings on CCDCFS's motion to modify on November 18, and December 6, 2019. Before the hearing began on November 18, CCDCFS amended its motion with respect to D.C.S., requesting that the court grant legal custody of him to his father. The following evidence was presented at trial.

{¶ 15} CCDCFS first presented Angela Thompkins to testify. Thompkins worked for CCDCFS as a supervisor in the extended service department. She had been with the agency for 25 years. She stated that mother's children were in their "second round" of agency custody. The first time occurred in 2015, when the agency had custody of the children for "about a year." She said they returned home with CCDCFS having protective supervision of them for approximately 11 months, and "they re-entered care again in November of 2017." She stated that the prior concerns with mother involved substance abuse, mental health, and housing issues. Mother was offered housing assistance, mental health assessment and services, medication management, and substance abuse treatment.

{¶ 16} Thompkins testified that in November 2017, the children were removed from mother's care again due to issues with her mental health and stability, substance abuse, and "poor housing." The children were placed with the same caregivers who had them in 2015 and 2016.

{¶ 17} Thompkins testified that the agency developed a case plan for mother that included mental health, substance abuse assessment and any recommended treatment, maintaining stable housing, and visitation with the children. The goal of permanency was reunification.

{¶ 18} In the spring of 2019, CCDCFS held a "staffing" where mother participated. The children's caregivers were also present. Thompkins stated that mother had completed a parenting program by that point and "was engaged in some of her mental health services." But CCDCFS still had concerns because mother had not addressed her substance abuse issues. Mother told CCDCFS workers that her work was preventing her from "fully engaging in treatment." Thompkins stated that they also had concerns with mother's "inconsistency with the children." She stated that mother's weekly two-hour visits with the children were sporadic and inconsistent.

{¶ 19} Thompkins explained that after children have been in temporary custody for one year, CCDCFS hopes that a parent is farther along in his or her case plan. She stated that if children are going to be reunified with their parents, there should be "a pretty substantial period of extended day visits" and overnight visits, so that the providers and social workers can assess the parent's progress with his or her case plan. They want to know if the parent has "benefited from those services." Thompkins said they were past the first extension of temporary custody in the case "and were not at that point yet."

{¶ 20} Thompkins explained that mother had not entered a substance abuse program until "nearly 14 months after [the children] had been in care." Moreover, she said that mother's attendance in the program was "seemingly sporadic." Because mother had not had a significant period of maintaining sobriety, CCDCFS would still not recommend overnight visits. Thompkins stated that it was difficult to continue to recommend reunification when mother could not have overnight visits with the children, especially when this was their second time in CCDCFS's temporary custody. Thompkins explained that before the agency will recommend reunification, they "look for a minimum of four to six weeks of overnight visitation," and they had not been able to do that in this case due to "lack of timeliness to complete the case plan." Further, Thompkins said that in this case, she would have recommended a longer period of overnight visits because this is the second time the children were in the agency's temporary custody.

{¶ 21} Thompkins testified that at the spring staffing, they discussed the caregivers' willingness to accept legal custody of the children and D.C.S. possibly "going with his father." The caregivers agreed to take legal custody of the children, which is why CCDCFS first moved to modify temporary custody to legal custody to the caregivers. But the caregivers later changed their minds and said that they preferred to adopt the children, so CCDCFS amended the motion to request permanent custody. With respect to D.C.S., CCDCFS amended the motion to request that his father obtain legal custody of him.

**{¶ 22}** Thompkins explained that she believed it was in four of the children's best interest to be placed in the permanent custody of the agency and for D.C.S.'s father to obtain legal custody of him. As a supervisor, she stated that when children come into care for a second time, it is more emotionally traumatic. In this case, the children were back in agency care after "only 11 months."

**{¶ 23}** Thompkins explained that D.S., the father of D.C.S., had been having overnight weekend visitation with D.C.S. on a weekly basis for 9 to 12 months. She stated that she did not have any concerns with D.S. obtaining legal custody of D.C.S. D.S. tested negative for drugs when they asked him to submit a urine screen and he completed two anger management classes. D.S. was employed, had stable housing, and had the ability to provide for D.C.S. Thompkins further stated that since D.C.S. had been staying with his father, there were no reports of violence in the home.

**{¶ 24}** C.D. (the twins' paternal aunt) testified that A.D., D.C.S., and J.C-A. had been with her throughout the pendency of the current case and the previous case. C.D. testified that in the past, mother would call and say she was going to visit, but then not come. But C.D. said mother had been doing better "for a couple of months." Sometimes mother would tell C.D. that she had to work or that "she just couldn't make it."

**{¶ 25}** C.D. testified that she originally agreed to accept legal custody of the children but said that she later changed her mind because she misunderstood what it meant. C.D. agreed that she preferred adoption "of her niece and nephew" if that became necessary. C.D. believed that D.C.S. should be with his father.

{¶ 26} D.D., the twins' paternal grandmother, testified that she is the current caregiver for K.E.D. and K.D. She said that the children were doing well. She explained that she stopped visitation at her house because mother would constantly change the visitation time and day, or not show up at all. D.D. explained that the canceled visitations upset the children, and they would "act out." D.D. stated that she originally agreed to take legal custody of the children but then decided that she would rather adopt them because she did not want the children to "be back in the system again." She stated that if the children remained in her home after permanent custody was granted, she would still allow them to see mother but not in D.D.'s home. D.D. stated that she hates to see her grandchildren hurt when mother does not show up to visit.

{¶ 27} Shaunte Nance, the social worker who became involved in the case in March 2019, testified that mother had substance abuse issues, including marijuana and narcotics, a history of mental health issues, parenting, and anger management. She stated that K.E.D. and K.D. have the same father, and the remaining children have different fathers. K.E.D. and K.D.'s father had never been involved in the case. A.D.'s father visited her and tried to obtain housing, but he never worked on the sobriety portion of his case and was not consistent with visitations. J.C-A.'s father initially wished to establish paternity and get involved, but he never did.

{¶ 28} Nance stated that D.S. had been actively involved with his son's case. She said that D.S. did everything the agency asked him to do. Although D.S. had a criminal history of assault, it was not against children. D.S. also completed two

anger management classes and benefited from them because he had not had any other incidents. She said that D.S. and D.C.S. have a "beautiful relationship." She said that D.C.S. has been staying overnight with his father on weekends for almost a year.

{¶ 29} By the time Nance received the case, she stated they "were on the second extension" and "time was running out." She explained that the agency was not prepared to recommend increased visitation at that time due to mother's lack of case-plan progress. Nance further explained that mother was not consistently visiting the children, so it was difficult to increase visitations or allow overnight visits.

{¶ 30} Nance testified that at the staff meeting in the spring of 2019 and at the semiannual review ("SAR") in April 2019, they discussed mother's case-plan progress and whether there had "been a behavioral change" in mother after she received services. Nance testified that she believed it was in the children's best interests to be placed in the permanent custody of the agency. She explained that mother had a history with the agency since 2009. Mother had "taken the same services with different providers over and over and over again, yet there has been no behavioral change." Nance stated that because of this, the children had to "come back in custody not once, but two times." Nance explained that the "children love their mother, but they're distraught." Nance said that the children needed stability and permanency.

**{¶ 31}** Nance further testified that mother had originally started substance abuse treatment, but then quit the program. Mother did not start another substance abuse program until April 2019. Nance stated that mother received an assessment at New Visions and "attended their Intensive Outpatient Program." New Visions also conducted urine drug screens on mother. Nance stated that mother was at New Visions for approximately "three or four months." Mother also had another positive test in May 2019. Mother participated in substance abuse counseling at New Visions, but not mental health counseling. In September, mother tested positive for marijuana in hair screen drug test and tested positive for opiates and amphetamines in a urine drug screen in May and June 2019.

**{¶ 32}** Nance testified that mother's visits with the children had been sporadic. Mother was supposed to visit the children weekly but did not consistently do so. Nance stated that based upon mother's lack of case-plan progress and lack of consistent visitation, the agency had not been able to increase visitations to establish if mother had benefited from the services that she received. Nance explained that at first, mother had "free visits" with the children at the caregivers' homes. But because mother did not consistently visit K.E.D. and K.D., paternal grandmother complained in May 2019 and no longer allowed visitations at her house after that. Therefore, the agency set up visitation with all the children at the paternal aunt's house. Nance explained that it worked at first but then it did not. Nance then attempted to set up visits at the Garfield Heights Collaborative through email, but she never got a response. She also made calls to the Collaborative, but never

received a response.  She explained that the Collaborative is so overwhelmed with visits from the county that they do not always respond.

{¶ 33} Nance stated that she also set up some visits at the Garfield Heights Library and at a McDonald's in Garfield Heights in the summer of 2019.  Nance said that the visits were going well, and mother had cancelled only once.

{¶ 34} Nance stated that all the children were doing well in their placements. A.W. was misbehaving in school, but she was in therapy and addressing the issue. D.C.S. also had some behavioral issues, but when his father "stepped up and started having" increased visits, those issues decreased.  J.C-A. was also having some behavioral issues in school, but he was working with a provider to address them. K.E.D. and K.D. love their paternal grandmother and were doing well.  The siblings get to visit with each other frequently.  Nance explained that D.S. stated that he would continue D.C.S.'s relationship with his siblings if he obtained legal custody.

{¶ 35} Nance testified that she has observed mother's visits with the children.  She said mother "kind of allows them" to "do what they want to do."  But during visits with K.E.D. and K.D., mother was "very attentive to their needs," reading books to them and playing with them.

{¶ 36} On cross-examination, Nance agreed that in October 2018, when CCDCFS requested and received a six-month extension of temporary custody, mother had completed anger management and parenting classes, had stable housing and employment, and was engaged with FrontLine Service.  But in October 2018, mother had not been submitting to random urine screens as requested and

had to be reminded that verified sobriety was necessary before reunification could occur.

{¶ 37} Nance further agreed that mother had continued to work with FrontLine. However, Nance explained that mother used FrontLine only for "case management" and not for mental health services.

{¶ 38} Nance further testified that mother completed anger management with a psychiatrist at Kee Essentials but did not obtain psychotherapy with the psychiatrist. Mother had completed a mental health assessment. The recommendation was for mother to "get ongoing weekly psychotherapy counseling," anger management, and to take all medications for bipolar disorder, posttraumatic stress disorder, and depression. Nance testified that mother did not pick up her medications in September 2019, but she did the other months (since she started them in June).

{¶ 39} Nance stated that mother's current therapist was Tiona Gosha. Nance explained that Gosha worked with mother on her anger management issues, but not psychotherapy until November 2019. Nance agreed that mother graduated from anger management in August or September 2019. Nance asked Gosha if she could provide individual counseling to mother because "the only thing that [Gosha] worked" on with mother was her anger management. Nance explained that she did not obtain Gosha's contact information until early November 2019. Nance had requested Gosha's information from mother several times and attempted to find it on her own but could not.

{¶ 40} Mother requested that she be granted legal custody of all children with protective supervision. She presented five witnesses on her behalf.

{¶ 41} Mother presented Dr. Annette Kee as her the first witness. Dr. Kee testified that she works for Kee Essentials as a mental health nurse practitioner. She stated that she has a doctoral degree with a registered nurse license and a Mental Health Nurse Practitioner certification. She had been a registered nurse for almost 20 years and a mental health nurse practitioner for 20 months. As a mental health nurse practitioner, Dr. Kee stated that she was able to prescribe mental health medications.

{¶ 42} Dr. Kee testified that she had been working with mother since May 2019. She conducted an initial psychiatric evaluation on mother. As part of that process, Dr. Kee explained that she reviews the client's history, mental health history, past mental health medications, any traumas that he or she has experienced, and family history of mental illness. Dr. Kee stated that she believed mother was "open and honest" during her evaluation. Dr. Kee said that she handles mother's medication management, not therapy. She stated that mother had been receiving therapy from Tiona Gosha.

{¶ 43} Dr. Kee testified that she first prescribed mother medication on June 11, 2019, including Abilify, Zoloft, Trazodone, and a multivitamin, and that she believed mother had been compliant in taking that medication. Dr. Kee explained that she had seen "a huge improvement" in mother "as far as how she felt when she first came until now." Dr. Kee said that she initially saw mother once per month,

but now sees her every four to eight weeks. She explained that she did not need to see her as often because mother had improved.

{¶ 44} On cross-examination, Dr. Kee agreed that her notes state that mother "suffers from bipolar disorder, current episode, manic without psychotic features." Dr. Kee agreed that mother told her that she has "depression, sadness, racing thoughts, irritability, mood swings and anxiety, appetite changes, insomnia, and difficulty staying asleep." Mother also told her that these symptoms were "severe and consistent." Mother also told her that she had "some suicidal attempts in the past" and had been a victim of domestic violence. Mother also told Dr. Kee that she had used "cannabis" in the past. Dr. Kee also agreed that when mother came to see her in May, mother had not been on any medications.

{¶ 45} Mother called Callie Misenko, the records custodian for CET-Advantage, to testify next. Misenko stated that she was a medical review officer assistant at CET-Advantage. She receives "the results from a drug screen" and analyzes them. She identified a document that contained the results from a September 24th hair test from mother, which was positive for marijuana. Misenko explained that with respect to a "hair screen," it takes the body "anywhere from three to six months" to process it. For urine screens, it takes approximately 30 days for the body to process it.

{¶ 46} Misenko agreed on cross-examination that for amphetamines and opiates, they can metabolize in the body within a few days. Therefore, if someone tests positive for them in a urine test in July and tests negative in a hair test in

September, that does not mean that the person did not take the drugs in July. Misenko agreed that there could be "some occasional use" of amphetamines or opiates that would not show up in a hair test. She further agreed that a hair drug test would pick up Abilify, Zoloft, and Trazodone, but mother's September hair test did not show the presence of these prescribed drugs. But Misenko explained that those prescriptions drugs often "show up in Benzos which [were] not tested for on the hair test." She also agreed that the prescription drugs would show up in a urine test, but mother did not test positive for them in her urine test either. But she agreed that the levels could be so low that they would not show up even if mother was taking them.

{¶ 47} Mother presented Johany Mercado to testify on her behalf. Mercado was a Community Psychiatric Treatment Specialist and case manager at Frontline Service. She explained that Frontline Service provides services to homeless people or people who had been homeless in the past. Mercado was mother's case manager at FrontLine. Mercado testified that she had been meeting with mother twice a week for five years, beginning in January 2016. She said that mother consistently made her appointments. Mercado explained that it is her job to help mother maintain "mental health, stability, and housing."

{¶ 48} Mercado identified mother's case file, which was 609 pages. She stated that mother had anger issues in the past, mostly around issues involving her children, significant others, and housing. She helped mother deal with her anger by teaching her coping and problem-solving skills. She believed that mother had

improved. She said mother has learned to "keep herself calm in order to take care of what she has to do." She stated that she noticed a change in mother approximately two and a half years ago "when [mother] started working for Burger King."

{¶ 49} Mercado testified that in her opinion, mother's relationship with her social worker at CCDCFS was not good. Mother becomes very angry when she interacted with her social worker. Mercado explained that when mother is with a CCDCFS worker, she becomes very upset at times because she feels like "she's not being listened to."

{¶ 50} Mercado stated that mother was always open and honest with her, and she did not believe that mother minimized her substance abuse issues. Mercado testified that mother moved into new housing in June 2019. If mother continued to meet with Mercado at least once per month, Mercado stated that mother would receive a lifetime housing voucher from Eden, an organization that provides housing subsidies to clients who are homeless or have been homeless.

{¶ 51} Mercado identified one of her case notes from February 19, 2019. Mother called Mercado after her SAR meeting with CCDCFS and told Mercado that she was upset because CCDCFS was going to file for permanent custody because she tested positive for marijuana. Mother did not understand what she was doing wrong "when she is employed, has her car, house, and is doing things right and nothing counts except her positive drug test." Mother also told Mercado that paternal grandmother "lied at the SAR saying that [mother] fails to come and see the children

for home visits." Mother told Mercado that the paternal family "fails to be available when she is not working and when she has the free time to go and see the children."

{¶ 52} On February 20, 2019, mother met with Mercado briefly. Mother was still very tearful when speaking about her children. Mother reported that she contacted Recovery Resources to try to get clean. Regarding mother's visitation with the children, Mercado advised mother to contact the social worker to see if mother could visit with the children at a place in the community rather than the children's family. Mercado said that mother reached out to the social worker, but Mercado could not recall what happened as a result.

{¶ 53} On June 3, 2019, Mercado met with mother when mother was "anxious and tearful." Mother told Mercado that she was "feeling very overwhelmed and upset, that she [felt] alone for her upcoming custodial hearing." Mother told Mercado that she continues to attend her intensive outpatient program, remain clean, and maintain housing, but mother believed that was not enough for CCDCFS. Mother felt depressed and hopeless. Mother told Mercado that she had "not seen her twins since March and little effort from the children's grandmother has been made to meet with client and other siblings for visitation." Mercado stated that mother was very depressed and overwhelmed because of the lack of visitation.

{¶ 54} On June 10, 2019, mother reported to Mercado that she was feeling "very depressed, lonely and overwhelmed." Mother stated that she had "little support from her family and it's also hard for her trust people." Mother further stated that she still had "not been able to see her twins and that every time she tries

to set a time and a date to meet with the children, the grandmother continues to make excuses, and she's still not able to meet with them."

{¶ 55} On June 14, 2019, mother called Mercado to report that she was very upset because "once again she was stood up by the children's grandmother." Mother stated that she waited almost two hours "for her children to show up at the park for a visitation day and they never called or showed up." Mercado obtained the social worker's number and left her a message "explaining the situation" that mother had "not been able to see the twins in four months." Mercado stated that the social worker did not call her, but the social worker did call mother the following day.

{¶ 56} On June 26, 2019, mother told Mercado that she was very happy and relieved that she was able to visit with all her children together, including the twins. Mother told Mercado that she was able to get all her children together with the assistance of her new attorney. Mercado stated that mother was very positive when she was able to visit with her children.

{¶ 57} On cross-examination, Mercado read from her February 8, 2019 note. Mother told Mercado that she only takes her prescribed medications "as needed" because they make her feel weird. Mercado told mother that she needed to take them daily as prescribed rather than "as needed." Mercado also agreed that when mother told her in June 2019 that she had been clean since May 2019, that by her own statement, mother had still been "using substances prior to that time." Mercado further agreed that everything that was written in her notes about mother came from mother self-reporting. Mercado did not independently verify what

mother told her. Mercado also agreed that she was not mother's therapist. She was therefore not capable of providing mother mental health services.

{¶ 58} Joanne Wilkinson, an Administrative Coordinator at New Visions Unlimited, testified on mother's behalf. She explained that she was the custodian of records for New Visions. Wilkinson explained that mother obtained a drug assessment at New Visions. Larry McCrimager and Nicole Morton had been mother's evening drug counselors. Neither one still worked at New Visions.

{¶ 59} Wilkinson identified documents from mother's case file at New Visions that were created by McCrimager and Morton. Wilkinson also identified the results of mother's drug assessment from New Visions, which was dated February 12, 2019. She explained that mother was diagnosed with "alcohol use disorder, moderate cannabis use disorder, severe, and she was recommended for Intensive Outpatient Treatment." In April 2019, mother's intake note states that she "was not receptive" to questioning "and stated that she was only [there] to complete this program and get her kids back, 'no more no less.'" These notes further state "client states that she self-medicates rather than taking her medications as prescribed." Mother's discharge notes stated that mother "did not share a lot."

{¶ 60} Wilkinson stated that mother successfully completed her intensive outpatient treatment, which included a "therapy component." She was given a certificate of completion, which was dated July 22, 2019. She said that for someone to successfully complete intensive outpatient treatment, he or she must complete 9 hours per week for 12 weeks. The person must then "do immediate aftercare," which

Wilkinson explained is "twice a week for four weeks, so it's a total of 16 weeks of treatment." Mother began the treatment on April 1, 2019, and completed it on July 24, 2019.

{¶ 61} Wilkinson identified an exhibit that she said was "a compilation of all of her complete file and notes from her treatment." She agreed that it included mother's progress notes related to her therapy. It also included mother's urine screen results. Wilkinson stated that before the beginning of each class, they provide a "random drip list." If a client's name is on the list, they have to give a urine sample. She identified lab results from mother's tests. Wilkinson stated that mother tested positive for marijuana at a level of 486 ng/ml on February 12, 2019. Mother tested positive for marijuana at a level of 971 ng/ml on April 8, 2019. Mother's next test was on April 15, 2019; she tested positive for marijuana at a level of 345 ng/ml. On April 29, 2019, mother tested positive for marijuana at a level of 24 ng/ml. On May 6, she tested positive for marijuana at a level of 68 ng/ml. On May 13, she tested positive for marijuana at a level of 19 ng/ml. On May 20, she tested positive for marijuana at a level of 21 ng/ml. Wilkinson agreed that mother's test results in April and May showed a decreasing level of marijuana. Wilkinson further agreed that from May 28, 2019, to August 22, 2019, mother consistently gave urine drug screens, and her levels of marijuana were zero throughout that time.

{¶ 62} Mother also tested positive for opiates on April 8, May 20, and June 17, 2019. Mother tested positive for methamphetamines on July 16, 2019.

Wilkinson said that if someone tests positive during the program, it does not always affect their ability to continue with the program. It is based on the individual.

{¶ 63} Wilkinson reviewed mother's drug counseling notes from May 2019. At a May 9, 2019 session, mother asked counselor for some Motrin for a headache that she said she had for three weeks. Mother told the counselor that her blood pressure had recently tested at 164 over 100. Mother then missed her May 9, 2019 group-therapy session that same day because she went to the hospital at the recommendation of her counselor.

{¶ 64} Wilkinson read mother's progress notes from May 29, 2019, into the record. According to the notes, the counselor had contacted mother about her positive drug test from May 20, 2019. Mother denied using any substances but said that the hospital gave her several medications, including Tylenol with Codeine. The counselor told mother to bring documentation of those medications to her next group session. Wilkinson read mother's discharge summary from the program. It lists medications that mother took throughout the program. Mother was prescribed 300 mg of Tylenol with Codeine every four hours or as needed.

{¶ 65} Mother's progress notes from July 22, 2019, stated that "when called upon, client declined to participate. It is questionable whether client benefited from today's session." Mother's progress notes from July 27, 2019, which stated that mother continued to engage in therapy and appeared to be benefitting from it. Mother's counselor further reported that although mother tested positive for

methamphetamines, mother is taking Trazodone, "which has proven to cause false positive for a methamphetamine."

{¶ 66} On cross-examination, Wilkinson agreed that during the four-month program, mother missed 15 group-therapy sessions, which were three hours each. She also agreed that on the lab reports from Millennium Health, it did not list Trazodone as a possible drug that causes a false positive for amphetamines or methamphetamines.

{¶ 67} Gosha testified that she was a licensed professional counselor or therapist. She has a master's degree in clinical pastoral counseling. She explained that she is also a registered nurse. Gosha stated that she is self-employed, but contracts through Hope Behavioral Health.

{¶ 68} Gosha began working with mother in May 2019, after a referral from Dr. Kee. Gosha stated that mother told her that she needed to work on her anger management issues and learn how to control her feelings and actions. Gosha explained that based upon what mother told her, she only worked on mother's anger management issues. She stated that she uses cognitive behavioral therapy to help a client "look at their faulty thoughts" and "help them correct their myths," which helps "them change their emotions" and "their behaviors."

{¶ 69} Gosha identified a progress report regarding mother's counseling that she authored on September 9, 2019. Mother began working with Gosha on her anger management on May 16, 2019, and completed it on September 8, 2019. In the report, Gosha stated that mother successfully completed seven sessions of an "anger

management series utilizing cognitive behavior model." She believed that mother benefited from the sessions. Gosha stated that mother was "definitely a different person when we got to the end of our sessions for anger management."

{¶ 70} Gosha testified that she believed mother's anger stemmed from her life experiences, including trauma she experienced as a child and from domestic violence that she experienced as an adult. Gosha explained that mother did not "trust anyone."

{¶ 71} Gosha stated that she spoke to Nance a couple of times in November 2019 about providing mother with anger management therapy. Gosha said that she and Nance disagreed about what cognitive behavioral therapy meant. Gosha explained to Nance that cognitive behavioral therapy "is a form of individual therapy."

{¶ 72} Gosha stated that when some people finish anger management counseling, they are done. But when Gosha spoke to Nance on November 12, 2019, she received "the whole case plan from the social worker." Gosha stated that after she read mother's case plan, she learned that there were "some things that [she] could work [on] with this mother." Gosha explained that if she would have had the information in mother's case plan, including information in mother's psychological report, "it would have made a major difference in the way" that she counseled mother. She said that according to the psychological report, mother needed additional therapy in addition to anger management. Gosha stated that she would not have ended mother's case on September 8, 2019. Gosha further stated that she

had had two therapy session with mother in November since she received the information from Nance.  Gosha said that she would continue to work with mother to provide individual therapy once per week, twice a month.  Mother could also have online sessions with Gosha twice per month in addition to the face-to-face meetings.

{¶ 73} On cross-examination, Gosha stated that she never addressed the issue of "behavior of children" and how that affected mother's anger.  Gosha said that she did not know that mother had threatened to harm her children, so she "never talked about behavior of children and dealing with that."  Gosha said that based on that information, she would recommend that mother receive "parent therapy," but Gosha does not provide that service.

{¶ 74} The GAL testified that based on the evidence that he heard at court, mother had not fully complied with the case plan services.  The GAL stated that they were "at the two-year mark here" and mother "came late to the game."  The GAL stated J.C-A. was too young to discuss her wishes, but he spoke to the other children.  D.C.S. wished to have a relationship with his mother and siblings, but "liked going to dad's and liked being there."  Regarding the other children, the GAL testified:

> In talking with the other children, they hoped for a relationship with mom, and I think again with the relatives there can be that, but they were happy, content, and hoped and indicated that they were fine with staying there living there with the current placement.  So again, they were hoping for continued contact.

{¶ 75} The GAL explained that the children were doing very well in their respective placements and mother was still "grappling" with her issues.  The GAL explained that the standard "we're looking at * * * at this time" is "the best interest

standard for the children." In that regard, he stated that he believed it was in the children's best interest to have permanency. Therefore, he recommended D.S. be given legal custody of D.C.S. and that the agency receive permanent custody of the remaining children.

## II. Permanent Custody Determination

{¶ 76} In her sole assignment of error, mother argues that the juvenile court's award of permanent custody and termination of parental rights was against the manifest weight of the evidence.

{¶ 77} Parents have a basic and fundamental interest in the care, custody, and management of their children. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). The Ohio Supreme Court recognizes this right as well. *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990); *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 28. Parental rights, however, are not absolute, and a parent's natural rights are always subject to the ultimate welfare of the child. *In re K.M.*, 10th Dist. Franklin Nos. 15AP-64 and 15AP-66, 2015-Ohio-4682, ¶ 15, citing *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979). "By terminating parental rights, the goal is to create a 'more stable life' for dependent children and to 'facilitate adoption to foster permanency for children.'" *In re L.W.*, 8th Dist. Cuyahoga No. 104881, 2017-Ohio-657, ¶ 21, quoting *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 67.

{¶ 78} The termination of parental rights is governed by R.C. 2151.414. *In re M.H.*, 8th Dist. Cuyahoga No. 80620, 2002-Ohio-2968, ¶ 22. R.C. 2151.414 sets

forth a two-part test courts must apply when deciding whether to award permanent custody to a public services agency. Under the first prong, a court must find by clear and convincing evidence one of the following five factors:

> (a) * * * [T]he child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents [in making this determination, the juvenile court must consider the factors set forth in R.C. 2151.414(E), which are set forth in the analysis below].
>
> (b) The child is abandoned.
>
> (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
>
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period[.]
>
> (e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

R.C. 2151.414(B)(1)(a)-(e).

{¶ 79} The second prong requires the court to find, also by clear and convincing evidence, that granting permanent custody of the child to the agency is in the best interest of the child. R.C. 2151.414(D)(1) sets forth best-interest factors that the court must consider when making the best-interest determination under R.C. 2151.414(D)(1), including:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child * * *;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) apply in relation to the parents and child.

{¶ 80} The juvenile court only needs to find one of the above factors in favor of permanent custody to terminate parental rights. *In re J.S.*, 8th Dist. Cuyahoga Nos. 101991 and 101992, 2015-Ohio-2701, ¶ 51, citing *In re Z.T.*, 8th Dist. Cuyahoga No. 88009, 2007-Ohio-827, ¶ 56. It is axiomatic that the best interest determination focuses on the child, not the parent. *In re Mayle*, 8th Dist. Cuyahoga Nos. 76739 and 77165, 2000 Ohio App. LEXIS 3379, 17-18 (July 27, 2000), citing *Miller v. Miller*, 37 Ohio St.3d 71, 75, 523 N.E.2d 846 (1988). Indeed, R.C. 2151.414(C) expressly prohibits the court from considering the effect the granting of permanent custody to a children services agency would have upon the parents.

{¶ 81} An appellate court will not reverse a juvenile court's decision awarding permanent custody to an agency if the judgment is supported by clear and convincing evidence. *In re J.M-R.*, 8th Dist. Cuyahoga No. 98902, 2013-Ohio-1560, ¶ 28. "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 477, 120

N.E.2d 118 (1954). A reviewing court is required to examine the record to determine whether the trier of fact had sufficient evidence to satisfy the clear and convincing standard. *In re T.S.*, 8th Dist. Cuyahoga No. 92816, 2009-Ohio-5496, ¶ 24.

**A. The First Prong**

{¶ 82} Mother argues that the trial court's finding that the children cannot be placed with her within a reasonable period of time under R.C. 2151.414(B)(1)(a) is not supported by clear and convincing evidence. In determining whether children can be placed with a parent within a reasonable amount of time, courts must look to the factors set forth in R.C. 2151.414(E). Mother argues that the evidence fails to support the juvenile court's findings under R.C. 2151.414(E)(1), (4), (6), and (10), and therefore the first prong was not met under R.C. 2151.414(B)(1)(a).

{¶ 83} However, the juvenile court also made a finding under R.C. 2151.414(B)(1)(d), that the children had been in the agency's custody for 12 or more months of a consecutive 22-month period. R.C. 2151.414(B)(1) requires only one of the factors to exist to satisfy the first prong of the statute. Therefore, when a trial court makes a finding under R.C. 2151.414(B)(1)(d), and the record supports that finding, that is sufficient to satisfy the first prong of the permanent custody statute regardless of any other factor. "As this court has repeatedly recognized, 'application of [R.C. 2151.414(E)] is unnecessary * * * because an award of permanent custody under R.C. 2151.414(B)(1)(d) requires no such determination.'" *In re M.S.*, 8th Dist. Cuyahoga Nos. 101902, 101903, 101904 and 101905, 2015-

Ohio-882, ¶ 27, quoting *In re K. & K.H.*, 8th Dist. Cuyahoga No. 83410, 2004-Ohio-4629, ¶ 31.

{¶ 84} After review, we find that the record clearly and convincingly supports the trial court's finding under R.C. 2151.414(B)(1)(d). For purposes of calculating temporary custody for the "12 of 22" provision, R.C. 2151.414(B)(1) states that "a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home." In this case, the children were removed from the home on November 7, 2017; 60 days from that date was January 6, 2018. CCDCFS did not move to modify its temporary custody to legal custody until March 29, 2019 (and later by amendment of that motion, for permanent custody on May 30, 2019).

{¶ 85} Therefore, we do not need to address mother's arguments that the record does not support the juvenile court's findings under R.C. 2151.414(E) (or R.C. 2151.414(B)(1)(a)) because even if she is correct, the record supports the juvenile court's finding under R.C. 2151.414(B)(1)(d), which does not require a court to make R.C. 2151.414(E) findings.

**B. The Second Prong**

{¶ 86} Mother further argues that the trial court's best-interest findings were not supported by the record.

{¶ 87} With respect to the first best-interest factor, the juvenile court found that (1) the children have a positive relationship with their siblings, (2) they had been

placed with their same caregivers with whom they had been placed during the agency's previous temporary custody in 2015 to 2016 and they were strongly bonded to their caregivers, and (3) they have a conflicted relationship with their mother. Mother does not make any argument regarding this factor.

{¶ 88} With respect to the second best-interest factor, the juvenile court found that A.W. (who was 11 at the time of the permanent custody hearing) and the twins (K.D. and K.E.D., who were seven at the time of the permanent custody hearing) were happy where they were placed but "would like to have some relationship with [m]other." J.C-A. was too young to express his wishes. Mother contends that the GAL testified that the children were happy in their placements "but did not testify to their wishes." However, the juvenile court found that permanent custody was "not in conflict" with the children's wishes based upon the GAL's testimony. The record supports this finding. The GAL testified that D.C.S. liked going to his dad's and liked being there. The GAL stated that the other children "hoped and indicated that they were fine with staying there living there with the current placement."

{¶ 89} With respect to the third best-interest factor, the juvenile court found that the children had been in the agency's custody for 12 or more months of a consecutive 22-month period, and that they had previously been in the agency's temporary custody "for similar issues." We already determined that this finding is clearly and convincingly supported by the record, and mother does not make any argument regarding this factor. We further note that this best-interest factor

considers the children's "custodial history," and the children had previously been in the temporary custody of the agency. Indeed, the previous case had just ended 11 months before the children were removed from mother's care a second time.

{¶ 90} With respect to the fourth best-interest factor, the juvenile court found that all of the children were in need of permanency and that "no relative or individual had been identified as a willing and appropriate legal custodian" for them. The trial court further found that permanency could not be achieved without a grant of permanent custody to the agency. Mother contends that this finding "is the crux of [her] case." In making this argument, mother maintains that she "had taken substantial steps towards reunification" and that "permanent placement with [her] was a real possibility." She asserts that she completed her case plan requirements regarding CCDCFS's three primary concerns: substance abuse, anger management, and visitation. We will address each of mother's arguments in turn.

{¶ 91} Mother states that she completed her intensive outpatient treatment and "brought her marijuana levels down to zero." While this is true, mother did not start her intensive outpatient treatment until April 2019, 17 months after her case had started. Throughout April and May 2019, mother continued to test positive for marijuana, although the levels did decrease from the beginning of April until the end of May. And she did not test positive for marijuana after that (until a hair test in September 2019, but a hair test can show marijuana in the hair three to six months after someone last used it). But mother also tested positive for opiates in May and June 2019 and for methamphetamines in July 2019. Mother was prescribed Tylenol

with Codeine in May for a headache, but that does not explain the second positive opiate test. Further, although New Visions discounted mother's positive methamphetamine test because Trazadone can cause false positives, the drug testing company did not list Trazadone as a drug that can cause a false positive for methamphetamines (it did list other legal drugs that could).

{¶ 92} Moreover, the documentary evidence admitted as part of mother's case shows that mother failed to actively participate throughout her sessions at New Visions. Mother informed the intake worker that she was just there to complete the program to get her children back, "no more, no less." Another note from the sessions indicate that mother declined to participate and that it was questionable whether mother benefitted from the session. Mother's discharge notes from the program indicate that she "did not share a lot."

{¶ 93} Also, mother also missed 15 three-hour sessions in a program that was only 16 weeks long. Mother's case plan required her to actively participate in a drug treatment program if recommended and to attend all classes.

{¶ 94} Mother further asserts that she completed her anger management therapy. Mother did complete two anger management programs. However, her therapist testified that she did not work on mother's anger issues when her children misbehave. The therapist also did not work on individual therapy with mother. Throughout the case, mother did not have individual counseling as recommended from any of her providers. While she had a case manager at FrontLine who assisted

her with stressors in her life and housing issues, the case manager stated that she did not provide individual counseling to mother.

{¶ 95} Finally, mother argues that she consistently visited three of her children at C.D.'s home and that visitation with the twins at D.D.'s home "was exacerbated" and "not helped by CCDCFS and D.D." Both C.D. and D.D. testified that there were periods when mother was not consistent in visiting the children. The social worker also testified that there were times throughout her case plan when mother only visited her children every other week instead of weekly.

{¶ 96} With respect to the fifth best-interest factor, the juvenile court did not make any findings about mother.

{¶ 97} After review, we disagree with mother the record does not support the juvenile court's best interest findings. We conclude that the record clearly and convincingly supports the juvenile courts judgment granting permanent custody of four of mother's children to CCDCFS. Mother's sole assignment of error is overruled.

{¶ 98} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27

of the Rules of Appellate Procedure.

_____
MARY J. BOYLE,  PRESIDING JUDGE

EILEEN A. GALLAGHER, J., and
MARY EILEEN KILBANE, J., CONCUR