[Cite as *In re R.D.*, 2022-Ohio-4519.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE R.D., ET AL.                                :

Minor Children                               :                    No. 111798

[Appeal by R.K., Mother]                :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 15, 2022

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD20907351 and AD20907352

---

### *Appearances:*

Judith M. Kowalski, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Ashley R. Lockemer and Joseph C. Young,
Assistant Prosecuting Attorneys, *for appellee.*

EILEEN A. GALLAGHER, J.:

{¶ 1} Appellant-mother R.K. ("Mother") appeals the judgment of the
Cuyahoga County Court of Common Pleas, Juvenile Division (the "juvenile court"),
that terminated her parental rights and granted permanent custody of her minor
children — Ran.D. and Rai.D. — to appellee, the Cuyahoga County Division of

Children and Family Services ("CCDCFS" or the "agency").   Mother contends that the juvenile court's determination that permanent custody was in the children's best interest was not supported by clear and convincing evidence and that the juvenile court, therefore, erred and abused its discretion in granting permanent custody of the children to the agency.  For the reasons that follow, we affirm.

## I.      Factual Background and Procedural History

{¶ 2}   On August 31, 2020, CCDCFS filed a complaint for neglect and temporary custody of Ran.D. (d.o.b. July 31, 2014) and Rai.D. (d.o.b. January 15, 2017) along with a motion for predispositional temporary custody.  The complaint alleged that Mother "lacks appropriate decision making to provide for the children," that on or about January 6, 2020, Mother had "left Ran.D. home alone while she went to work" with "[t]he oven * * * turned on to heat the home," that "the home was in a deplorable condition" and that Mother was homeless and did not have stable housing in which to provide for the children.  The complaint further alleged that the children's father, Rah.D., ("Father") had been recently convicted of drug possession and that Father had physical limitations that precluded him from caring for the children.[1]  CCDCFS case worker Gabrielle Uhrin attested to the allegations of the complaint.  In her affidavit in support of the agency's motion for predispositional custody, Uhrin further averred that the agency had made a referral for parenting

---

[1] A prior complaint for neglect and temporary custody of the children was filed on January 7, 2020 (Cuyahoga J.C. Nos. AD20900140 and AD20900141) and the children were committed to predispositional temporary custody of the agency on that date.  The case was not resolved within statutory time limits and was dismissed.  The children have remained in the uninterrupted custody of the agency since that time.

classes and a CMHA housing referral but that Mother was "without housing" and that, although Mother was "currently engaged in services," she had not "yet demonstrated that she's benefitted from services."

{¶ 3} On August 31, 2020, the magistrate granted the agency's motion for predispositional temporary custody and committed the children to the emergency temporary care and custody of the agency. In granting the motion, the magistrate noted, "[M]other is currently engaged in services but has not yet demonstrated she has benefitted from the services and additional services must be completed to alleviate the risk to the child[ren]."

## A. Adjudication of Neglect and Temporary Custody

{¶ 4} An adjudicatory hearing was held on November 23, 2020. Mother stipulated to the allegations of an amended complaint,[2] and the children were

---

[2] The amended complaint alleged:

1. A complaint for Neglect and Temporary Custody was previously filed on January 7, 2020 and the children were committed to the emergency temporary custody of CCDCFS since that time. That matter was not resolved within the statutory guidelines and was dismissed. *See* Case Nos. AD20900140-41.
2. Mother lacks appropriate decision making to provide for the children. On or about January 6, 2020, Mother left Ran.D. home alone while she took child Rai.D. to daycare.
3. An individual arrived at the home and discovered that the child was without supervision. The oven was turned on to heat the home and the home was in deplorable condition.
4. Mother does not have stable housing in which to provide for the children. Mother is currently homeless.
5. Father was recently convicted of drug possession. *See* Case No. CR-19-641817-A.
6. Father has physical limitations which currently preclude him from caring for the children.

adjudicated to be neglected. The parties agreed to proceed immediately to disposition. Mother agreed to a disposition of temporary custody and the children were committed to the temporary custody of the agency.

{¶ 5} The agency then filed a case plan with the juvenile court. As it related to Mother, the case plan required Mother to complete a mental health assessment and comply with any recommended services, to attend a parenting program and learn proper parenting skills to make sound decisions in caring for and protecting her children, to obtain and maintain safe, clean and appropriate housing and to ensure the presence of an adequate and appropriate food supply in the home daily. As it relates to Father, the case plan required Father to maintain a relationship with his children and to financially support them as much as possible. The stated permanency goal of the case plan was reunification with Mother. The juvenile court approved the case plan but ordered the agency to submit an amended case plan that included substance abuse services for Father. The agency filed an amended case plan that required Father to undergo an alcohol and drug assessment and to comply with any recommendations.

{¶ 6} On December 22, 2020, the state filed a motion for a first extension of temporary custody. The state asserted that progress had been made on the case plan but that, because all of the case plan objectives had not yet been met, the risk to the children had not been sufficiently reduced and extension of temporary

---

Reasonable efforts were made by Cuyahoga County Division of Children and Family Services to prevent the removal of the children from the home and removal is in the best interest of the children.

custody was in the children's best interest. With respect to Mother, the agency indicated that Mother had "completed parenting services" and a substance abuse and mental health assessment but needed to "follow through on mental health recommendations, complete intensive out-patient treatment, and obtain stable and appropriate housing." With respect to Father, the agency indicated that Father had been visiting with the children and "needs to continue to develop his relationship with them." Mother agreed to the first extension of temporary custody.

{¶ 7} The juvenile court granted the first extension of temporary custody. As related to Mother, the juvenile court found that "Mother was referred for parenting classes, basic needs (housing), and substance abuse services" and that Mother had made "significant progress on the case plan." As related to Father, the juvenile court stated, "Father shall build a relationship with the child[ren]. Father is engaged in case plan services. Substance abuse services were added to the case plan for Father." The juvenile court ordered that both parents submit to "monthly, random drug testing by urinalysis," as requested by the agency.

{¶ 8} In April 2021, the agency filed an amended case plan removing Father from the case plan because he had not been "participating in case plan service, drug screens, etc." The magistrate approved the amended case plan.

{¶ 9} In May 2021, CCDCFS filed a motion for a second extension of temporary custody. The agency asserted that although "substantial additional progress" had been made on the case plan, because all the case plan objectives had not yet been met, the risk to the children had not been sufficiently reduced to return

the children to Mother's care. The agency further asserted that it had "reasonable cause to believe reunification is expected during this period of extension if granted" and that a second extension of temporary custody was in the children's best interest. With respect to Mother, the agency stated that Mother had maintained her sobriety since November 2020 and "remains engaged in after care to address substance abuse," that she "consistently visits with her children" and that she had completed parenting classes and was "working to obtain independent housing through CMHA." With respect to Father, the agency stated that Father was not engaged in case plan services, did not visit or communicate with his children and had not made himself available to become engaged in case plan services. Mother agreed to a second extension of temporary custody. An amended case plan was approved permitting Mother to have unsupervised visits with the children.

{¶ 10} On June 30, 2021, the juvenile court granted the motion for a second extension of temporary custody, finding that there had been "substantial additional progress on the case plan by Mother" since the first extension of temporary custody, that there was reasonable cause to believe that the children would be reunified with one of the parents or permanently placed within the period of extension and that the continuation of temporary custody was necessary and in the best interest of the children. The juvenile court indicated that the permanency plan for the children was legal custody to Mother with no restrictions. The juvenile court once again ordered Mother to submit to "monthly, random drug testing by urinalysis," as requested by the agency.

**{¶ 11}** On August 19, 2021, CCDCFS filed a motion to terminate temporary custody without protective supervision ("motion to terminate temporary custody"), seeking an order granting legal custody of the children to Mother with no restrictions, on the grounds that Mother had "successfully completed the case plan services," i.e., securing housing and completing parenting education and substance abuse treatment, and had "remedied the risks that initially caused the children to be removed."[3] The agency requested an "immediate hearing" on the motion "so that the children can be returned to their mother prior to the start of the 2021-2022 school year." Less than a month later, however, the agency began having difficulty contacting Mother and the guardian ad litem was unable to complete a home visit. Mother also failed to appear for the October 5, 2021 hearing on the agency's motion to terminate temporary custody. In November 2021, the agency withdrew its motion to terminate temporary custody, without objection, and filed an amended case plan requiring that Mother's visits with the children, once again, be supervised. The magistrate approved the amended case plan.

**{¶ 12}** On December 20, 2021, the agency filed a motion to modify temporary custody to permanent custody. In her supporting affidavit, Uhrin (who had been assigned to the case since February 2020) averred that Mother "does not have stable and appropriate housing in which to provide for the children," that Mother had "completed a mental health assessment which recommended substance

---

[3] No affidavit or other evidence was submitted in support of the motion to terminate temporary custody.

abuse treatment services for cannabis dependency" but had "failed to successfully complete" the recommended substance abuse treatment services and that Mother had "failed to submit to drug testing on a consistent basis" and continued to use marijuana. Uhrin further averred, with respect to Father, that Father had "not submitted to drug testing as required," had medical issues that prevented him from providing full-time care for the children and had failed to support the children on a consistent basis.

{¶ 13} Multiple continuances were requested due, in part, to difficulties in perfecting service on Mother. At a pretrial conference on March 2, 2022, it was noted that Mother "has been linked for [intensive outpatient] at Ohio Northern and is making progress on housing." At a pretrial conference on April 12, 2022, a continuance was requested "so that the Mother can secure housing." At a pretrial conference on May 16, 2022, the juvenile court ordered Mother to submit to a hair-follicle test.

{¶ 14} On May 31, 2022, Mother was indicted by a Cuyahoga County Grand Jury on felony charges of robbery and theft relating to an April 3, 2020 incident in which Mother allegedly stole the victim's credit card, handbag, keys and/or license or services. *See* Cuyahoga C.P. No. CR-22-670501-A. The criminal case was unresolved at the time of the hearing.

## B. The Permanent Custody Hearing

{¶ 15} On June 21, 2022, the juvenile court held a hearing on the agency's motion for permanent custody (the "permanent custody hearing"). At the time of the hearing, Ran.D. was seven years old and Rai.D. was five years old.

{¶ 16} At the hearing, the agency argued that it should be awarded permanent custody of the children because they had been in the custody of CCDCFS for more than 12 months of the 22-month period specified in R.C. 2151.414(B)(1)(d) and could not or should not be placed with Mother or Father within a reasonable period of time. The agency further argued that it was in the best interest of the children that they be placed in the permanent custody of the agency pursuant to R.C. 2151.414(D)(1)(a)-(e) and (D)(2) because the children had been in the custody of the agency for more than two years, they were not eligible for a planned permanent living arrangement due to their ages, no other interested person had sought legal custody of the children and the factors specified in R.C. 2151.414(E)(1), (2), (4), (14) and (16) applied.

{¶ 17} Mother argued that the agency's motion should be denied because Mother loves her children "very much," she, "at one point in time," was "actually very, very close to reunification" and she had "been working very hard to get back to that point in time" and remedy the conditions that led to the removal of her children.

{¶ 18} CCDCFS caseworker, Nicole House, was the sole witness to testify at the hearing. House stated that she had been assigned to the case in April 2022 but that she was familiar with the history of the case based on discussions with the

previously assigned case worker (Uhrin) and her independent review of the file. House testified that the agency first became involved in the case in January 2020, after it was reported that Mother had left Ran.D., who was then five years old, at home alone with the stove on and the home in a "deplorable condition." She indicated that a police officer brought Ran.D. to the agency and the agency later learned that there was a second child in the home, Rai.D. She indicated that it had been reported that the children had been "home alone like this a lot of times."

{¶ 19} House testified that, at the outset of the case, the permanency goal was reunification of the children with Mother. She stated that the agency developed a case plan to assist Mother in addressing issues with parenting, mental health, substance abuse[4] and housing. She testified that Mother had been referred for parenting services due to her failure to appropriately supervise the children and her poor parenting decisions, e.g., "leaving the kids home alone," and that Mother had completed parenting classes through Northern East Neighborhood Center, a Community Collaborative, in 2021.

{¶ 20} House stated that, based on the assessments Mother received and her discussions with Uhrin, it was her understanding that Mother was a "chronic marijuana user," who put her marijuana use ahead of taking care of her kids, i.e.,

---

[4] House testified that Mother's issues with substance abuse "came out" during Mother's mental health assessment and Mother's conversations with the prior CCDCFS case worker. For that reason, they were not among the issues identified in the complaint. House indicated that case plan services were added to address Mother's substance abuse issues once documented by the service providers and case worker.

continuing to use marijuana while struggling with basic needs and leaving her home in a deplorable condition. House explained:

> To my understanding, I think mom minimizes it and a lot of people do. That's common because they look at marijuana as a recreational drug. I'm just having fun. (Inaudible) legal. So they don't take it real serious. So I told her that a lot of her situation as far as history of lack of housing, could have possibly came from that because this is the thing.

> If you're using marijuana, it's your first choice. You could at times don't take care of your kids. Not on purpose. I don't know how you want to define it, but it's a concern because if you make it first and you've got to have it – * * *.

{¶ 21} House testified that because Mother had minimized her marijuana use and was "so adamant" in denying that she had a substance abuse problem, the agency initially thought Mother might have mental health issues. She indicated that it was later determined Mother did not have mental health issues and that mental health services "was taken off the case plan."

{¶ 22} House stated that, in an attempt to address Mother's marijuana use, the agency had referred Mother to four different substance abuse treatment providers but that Mother was "not consistent with drug treatment," i.e., she would "start and then drop it and then she will start back up again with something and then stop and then back and forth," and failed to complete substance abuse treatment programs at New Visions, Recovery Resources and The Centers.

{¶ 23} House stated that there had been two extensions of temporary custody and that because Mother had been making some progress on her case plan and "was headed in the right direction," in or around August 2021, the children

began having overnight visits with Mother and the agency filed a motion to terminate temporary custody. House stated that, based on her conversations with Uhrin, Uhrin, at that time, "went off a lot of what [Mother] told her," including Mother's statement that she had completed substance abuse treatment services, when the agency filed the motion to terminate temporary custody. House indicated that the agency soon learned that Mother did not, in fact, complete substance abuse treatment services when Mother's drug test results came back and "it was not what it was supposed to be," i.e., "one day [Mother] was negative for something and then she was positive," so Uhrin "recanted her statement" in the motion to terminate temporary custody that Mother had completed services.

{¶ 24} House testified that in or around October and November 2021, "things kind of unraveled" for Mother: Mother failed to appear at a court hearing for reunification; Mother had a positive drug screen and then "stopped dropping urine screens" for the agency; Mother lost her housing and began staying with various friends (the names and addresses of which were not provided to the agency) and Mother's overnight visits with her children stopped. Because "things ha[d] changed," the agency withdrew its motion to terminate temporary custody and made referrals for a new assessment for substance abuse treatment services. House indicated that Mother was, at that time, referred to Recovery Resources and then to The Centers for substance abuse treatment services but that Mother did not complete substance abuse treatment services.

{¶ 25} House testified that Mother began reengaging in substance abuse treatment services at NORA House in March 2022. According to House, Mother then "got a little lost, but she picked it up back up" in May 2022 and that she had been participating in an intensive outpatient treatment program for the last three weeks. House indicated that Mother had failed to comply with the agency's requests for random urine screens and a hair-follicle test,[5] but that Mother was submitting to weekly, scheduled urine screens at NORA House. House reported that, according to the services provider, Mother "was still testing positive" for marijuana and had "a long way to go" but that "her numbers were going down," indicating that she was "trying to stop it." House stated that regularly scheduled urine screens were not a substitute for the agency's random urine screens or a hair-follicle test because certain substances stay in a person's system for only a few days and if a person knows when a test is scheduled, they can avoid testing positive for those substances.

{¶ 26} With respect to housing, House stated that the agency had made multiple referrals for Mother for housing services but that Mother had not obtained stable and appropriate housing for the children and was currently homeless and living in a shelter, which House believed did not allow children. House indicated that although there are other shelters that would allow children, the agency would "never promote a shelter" as an appropriate living arrangement for a child. House

---

[5] With respect to the court-ordered hair-follicle test, House testified that Mother originally told her that she could not submit to a hair-follicle test because she had gotten into an accident and "couldn't cut her hair because her hair was injured." She stated that Mother later told her that she had completed a hair-follicle test on her own; however, the results of that test were never provided to the agency.

stated that she did not know the condition of the area of the shelter in which Mother was staying but indicated that no one from the shelter had informed her of any concerns regarding the cleanliness or condition of the shelter "by virtue of [Mother's] actions."

{¶ 27} House testified that the agency had referred Mother to the Cuyahoga Metropolitan Housing Association ("CMHA") and FrontLine for housing assistance but that Mother had missed multiple appointments with CMHA and had issues with her paperwork. House stated that when she took over the case, Mother was staying with a friend who "didn't want a social worker in their house." House indicated that she recommended that Mother go to a shelter because after thirty days at the shelter, Mother could receive a housing voucher. Although Mother went to a shelter and obtained a housing voucher, she never secured a home. House testified that Mother's difficulties in obtaining housing had been further complicated by Mother's May 2022 indictment on felony robbery and theft charges. House indicated that she spoke with Mother about the charges but that Mother minimized them, stating "it's nothing, nothing's going to happen," "I'm going to get out of this free, I ain't do anything." House stated that the pending criminal charges would affect Mother's ability to obtain housing through CMHA.

{¶ 28} House testified that there was a "good bond" between Mother and the children and that Mother had been consistent with weekly visitation, usually held at a fast-food restaurant or a park. She stated that Mother engaged with the children appropriately during visits, i.e., she was attentive to the children, purchased food for

the children and disciplined them appropriately when warranted.  House indicated that she had never observed Mother to be under the influence during her visits with the children.  According to House, the only problem with Mother's interaction with the children was her tendency to give the children "false hope," i.e., telling the children that they would be returned to her care on a particular date or that she would buy them gifts without following through.  House stated that she could not fully assess whether Mother was appropriately supervising the children during visits because House was there "supervising [Mother] with her kids," i.e., she could not give Mother "the opportunity to do it by herself" due to the uncompleted case plan services.  House indicated that Mother told her she was working but House had not been able to verify Mother's employment and income.  House stated that the "emotional" and "discipline piece[s] were there," but that Mother could not meet the basic needs of the children.

{¶ 29} With respect to whether any additional services could be put in place to assist Mother, House stated, "maybe" a parenting coach, but that the "biggest thing with [Mother's] basic needs, was her lack of consistency with basic needs and her failure to understand the importance of basic needs."  House explained:

> Kids need to know when they going to wake up in the morning, that they have a place to lay their head down and get up in the morning and go to sleep.  I mean, they're not staying all over the place, going to different school districts, 50,000 people['s] addresses.

{¶ 30} Turning to Father, House testified that the case plan originally included substance abuse treatment services for Father but that he was removed

from the case plan because he was not participating in case plan services, was not reporting information to the case worker, was "not dropping urine screens" as ordered by the juvenile court and had "gotten into some trouble again." House stated that it was her understanding that Father was currently in jail for a probation violation and new charges of trafficking fentanyl and cocaine, having weapons while under disability and "different things of [that] nature."

{¶ 31} House testified that since 2020, the children had been in three different placements. She stated that the children were originally placed with their maternal grandmother but that the grandmother disrupted the placement because she was not getting along with Mother and refused to continue to care for the children. House indicated that the children were then placed with a family friend but the caregiver disrupted the placement due to issues managing the oldest child's behavior. The children were then placed in their current foster placement, an adoptive foster placement, where, according to House, the children were "doing good." House testified that the children got along "really, really good" with their foster parent, that the foster parent was meeting the children's basic needs, that there were no safety concerns and that the foster parent had been working on identifying and engaging tutoring services to assist Ran.D. with her educational difficulties. House indicated that both children were receiving basic counseling through Cleveland Charities and that they planned to seek an IEP to address Ran.D.'s learning disabilities in the following school year.

{¶ 32} House testified that Father had identified his mother and another family friend as possible placements for the children but that neither was approved as an appropriate placement. She indicated that the children's paternal grandmother had stated that, although she loved the children, she was unable to care for them due to her age and health issues and that the family friend never made herself available to CCDCFS to become an approved placement.

{¶ 33} House stated that the agency believed permanent custody was in the children's best interest because Mother had "had a lot of time to do a lot of things" and had been "given a lot of opportunities to fix" her situation, but "she's taken this long not to do it." Despite having more than two-and-one-half years to obtain stable housing and even after obtaining a housing voucher, Mother never secured housing for the children. With respect to her substance abuse, Mother failed to comply with agency requests and court orders requiring her to submit to random urine screens and a hair-follicle test. House indicated that although Mother was "starting back doing everything now" by attending an intensive outpatient drug treatment program, not enough progress had been made and the "last-minute" nature of Mother's latest efforts caused the agency to question whether Mother would "actually truly benefit from what she's doing right now." House stated that there was nothing to indicate that Mother or Father could provide permanency for the children within the next several months or "in the near future." House indicated that Mother still needed to secure a home and show "consistency" with her substance abuse treatment. She stated that the current program in which Mother

was enrolled was eight to 12 weeks long followed by six to seven weeks of aftercare. House indicated that Mother's pending criminal case, involving serious charges, was also a concern regarding her ability to provide permanency and stability for the children even if her housing and substance abuse issues were resolved.

{¶ 34} Mother did not testify and did not present testimony of any other witnesses at the permanent custody hearing.

## C. The Guardian Ad Litem's Report and Recommendation

{¶ 35} On June 21, 2021, the guardian ad litem filed a written report and recommendation. Based on a review of records filed with the court and visits or interviews with Mother, the children's foster mother, House and the children, he recommended that the children be placed in the permanent custody of the agency to "enable the children to flourish and develop in a safe and stable environment."

{¶ 36} The guardian ad litem reported that Mother had had "mixed results" with her case plan. He noted that although Mother had been able to get extended visits with the children, she had lost her housing and was now living in a shelter – which he considered to be a "tenuous" placement because the program in which Mother was participating did not allow participants to have criminal cases and a capias had been issued for Mother's arrest. He indicated that Mother's failure to submit to urine screens requested by the agency, her failure to comply with the court-ordered hair-follicle test and her recent criminal charges "raises concerns about [Mother's] ability to stop using drugs." He further stated that "[w]hile [Mother] clearly loves her children, and has consistently visited her children," she

had "failed to take the necessary long-term steps (quit spending money on drugs and use it to pay the rent) for reunification" and that "[h]er present homeless situation, continued drug use, and now pending felony criminal matters make her unable to care for the children."

{¶ 37} With respect to Father, the guardian ad litem reported that Father had just started visiting with the children and had not yet had time to develop a strong relationship with them, that Father's case plan objectives "remain incomplete" and that Father was not available to care for the children due to three pending criminal matters, including a probation violation and new charges related to drug possession and trafficking and having weapons while under disability.

{¶ 38} The guardian ad litem reported that the children were "doing well" in their foster placement, that the children's basic needs were being met and that the foster placement provided the children a "loving, safe, and secure place to live."

{¶ 39} At the permanent custody hearing, the guardian ad litem reiterated his recommendation that permanent custody be granted to the agency. He stated that, at first, he believed this case was one that was "going for reunification," but that, in the last couple of months, it had "taken a huge turn downwards." He noted that Mother had picked up felony charges for robbery, involving thefts of bank cards or credit cards, "showing an immediate need for cash" and that, during that same period, Mother had refused to comply with the random drug screens requested by the agency and the court-ordered hair-follicle test. The guardian ad litem explained that he had requested the hair-follicle test out of concern that Mother might be using

more than marijuana after Father "picked up" a probation violation and two new cases involving weapons charges and trafficking in fentanyl and cocaine. He stated that Mother's failure to submit to these drug tests "raise[d] grave concerns for [him] regarding [Mother's] substance abuse" "because it's something that you can't hide"; "[o]nce you've used it, it will show up."

{¶ 40} The guardian ad litem indicated that he was also concerned that Mother "still finds herself residing in a shelter," unable to obtain stable housing. He indicated that there were points in time in which Mother had stable housing, "but then her income was obviously going into other activities," because Mother has not "consistently over the two-year period [been] able to meet the basic needs of the children."

### D. The Juvenile Court's Decision to Grant Permanent Custody of the Children to CCDCFS

{¶ 41} Following consideration of the evidence presented at the permanent custody hearing and the recommendation of the guardian ad litem, the juvenile court granted the agency's motion for permanent custody, terminating the parental rights of Mother and Father as to Ran.D. and Rai.D. On June 23, 2022, the juvenile court issued written journal entries, setting forth its findings (the "permanent custody order"). The juvenile court found, "by clear and convincing evidence," that the children had been in the temporary custody of the agency for 12 or more months of a consecutive 22-month period pursuant to R.C. 2151.414(B)(1)(d), that, pursuant to R.C. 2151.414(E)(1),(2), (4), (14) and (16), the children could not be placed with

either parent within a reasonable time or should not be placed with either parent and that, pursuant to R.C. 2151.414(D)(1) and (2), it was the children's best interest that permanent custody be granted to the agency.

{¶ 42} Mother appealed, raising the following sole assignment of error for review:

> The Cuyahoga County Juvenile Court erred and abused its discretion in finding that clear and convincing evidence supported granting permanent custody of the subject children to the Cuyahoga County Department of Children and Family Services.

## II.   Law and Analysis

{¶ 43} The right to raise one's own child is "'an essential and basic civil right.'" *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 67, quoting *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997); *see also In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990) (a parent has a "'fundamental liberty interest' in the care, custody, and management" of his or her child), quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). This right is not absolute, though. It is "'always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, 86 N.E.3d 1012, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

{¶ 44} Because termination of parental rights is "'the family law equivalent of the death penalty in a criminal case,'" *In re J.B.*, 8th Dist. Cuyahoga No. 98546, 2013-Ohio-1704, ¶ 66, quoting *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14, it is "an alternative of last resort." *In re Gill*, 8th Dist.

Cuyahoga No. 79640, 2002-Ohio-3242, ¶ 21. It is, however, approved "when necessary for the welfare of a child." *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, ¶ 7, citing *In re Wise*, 96 Ohio App.3d 619, 624, 645 N.E.2d 812 (9th Dist.1994). "'All children have the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation.'" *In re J.B.* at ¶ 66, quoting *In re Hitchcock*, 120 Ohio App.3d 88, 102, 696 N.E.2d 1090 (8th Dist.1996). Where parental rights are terminated, the goal is to create "a more stable life for the dependent children" and to "facilitate adoption to foster permanency for children." *In re N.B.* at ¶ 67, citing *In re Howard*, 5th Dist. Tuscarawas No. 85 A10-077, 1986 Ohio App. LEXIS 7860, 5 (Aug. 1, 1986).

### A. Standard for Terminating Parental Rights and Granting Permanent Custody to CCDCFS

{¶ 45} An agency may obtain permanent custody of a child in two ways. *In re J.F.*, 2018-Ohio-96, 102 N.E.3d 1264, ¶ 44 (8th Dist.), citing *In re E.P.*, 12th Dist. Fayette Nos. CA2009-11-022 and CA2009-11-023, 2010-Ohio-2761, ¶ 22. An agency may first obtain temporary custody of the child and then file a motion for permanent custody under R.C. 2151.413, or an agency may request permanent custody as part of its abuse, neglect or dependency complaint under R.C. 2151.353(A)(4). *In re J.F.* at ¶ 44. In this case, the agency obtained temporary custody and then filed a motion for permanent custody of the children.

{¶ 46} R.C. 2151.414(B)(1) establishes a two-part test for courts to apply when determining whether to grant a motion for permanent custody. A juvenile court may grant a public child services agency's motion for permanent custody if it determines, by clear and convincing evidence, that (1) permanent custody is in the best interest of the child and (2) any of the following applies:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

R.C. 2151.414(B)(1)(a)-(e). "Clear and convincing evidence" is that "measure or degree of proof" that "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *In re M.S.*, 2015-Ohio-1028, at ¶ 8. A juvenile court's decision to grant permanent custody will not be reversed as being against the manifest weight of the evidence "'if the record contains some competent, credible evidence from which the court could have found that the essential statutory elements for permanent custody had been established by clear and convincing evidence.'" *In re G.W.*, 8th Dist. Cuyahoga No. 107512, 2019-Ohio-1533, ¶ 62, quoting *In re A.P.*, 8th Dist. Cuyahoga No. 104130, 2016-Ohio-5849, ¶ 16.

{¶ 47} Mother does not dispute that CCDCFS met its burden of establishing that one of the conditions set forth in R.C. 2151.414(B)(1)(a) through (e) exists. Mother contends only that the juvenile court erred and abused its discretion in determining that granting permanent custody to the agency was in the children's best interest.

## B. Best-Interest Determination

{¶ 48} R.C. 2151.414(D)(1) states that in determining whether permanent custody is in a child's best interest, the court "shall consider all relevant factors," including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in [R.C. 2151.414(E)(7) to (11)] apply in relation to the parents and child.

{¶ 49} The best interest determination focuses on the child, not the parent. *In re N.B.*, 2015-Ohio-314, at ¶ 59. A juvenile court has considerable discretion in weighing the factors set forth in R.C. 2151.414(D)(1). Although the juvenile court is required to consider each statutory factor in determining what is in a child's best interest under R.C. 2151.414(D)(1), no one factor is to be given greater weight than the others. *In re T.H.*, 8th Dist. Cuyahoga No. 100852, 2014-Ohio-2985, ¶ 23, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. Further, only one of the factors set forth in R.C. 2151.414(D)(1) need be resolved in favor of permanent custody to support a finding that permanent custody is in a child's best interest and to terminate parental rights. *In re J.C.-A,* 8th Dist. Cuyahoga No. 109480, 2020-Ohio-5336, ¶ 80; *In re A.B.*, 8th Dist. Cuyahoga No. 99836, 2013-Ohio-3818, ¶ 17; *In re N.B.* at ¶ 53. We review a juvenile court's determination of a child's best interest under R.C. 2151.414(D)(1) for abuse of discretion. *In re P.B.*, 8th Dist. Cuyahoga Nos. 109518 and 109519, 2020-Ohio-4471, ¶ 76, citing *In re D.A.*, 8th Dist. Cuyahoga No. 95188, 2010-Ohio-5618, ¶ 47; *see also In re J.B.*, 2013-Ohio-1704, at ¶ 97 ("[T]he discretion that a trial court has in custody matters should be

accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned."). A juvenile court abuses its discretion where its decision is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). A decision is unreasonable if there is "'no sound reasoning process that would support that decision.'" *In re C.D.Y.*, 8th Dist. Cuyahoga No. 108355, 2019-Ohio-4987, ¶ 8, quoting *Baxter v. Thomas*, 8th Dist. Cuyahoga No. 101186, 2015-Ohio-2148, ¶ 21. A decision is arbitrary if it is made "'without consideration of or regard for facts [or] circumstances.'" *In re C.D.Y.* at ¶ 8, quoting *Black's Law Dictionary* 125 (10th Ed.2014).

{¶ 50} In addition to the best interest factors identified in R.C. 2151.414(D)(1), 2151.414(D)(2) sets forth a list of circumstances that, if all are found to exist, mandates a finding that permanent custody is in the best interest of the child. R.C. 2151.414(D)(2) states:

> If all of the following apply, permanent custody is in the best interest of the child, and the court shall commit the child to the permanent custody of a public children services agency or private child placing agency:
>
> (a) The court determines by clear and convincing evidence that one or more of the factors in [R.C. 2151.414(E)] exist and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.
>
> (b) The child has been in an agency's custody for two years or longer, and no longer qualifies for temporary custody pursuant to division (D) of section 2151.415 of the Revised Code.

(c) The child does not meet the requirements for a planned permanent living arrangement pursuant to division (A)(5) of section 2151.353 of the Revised Code.

(d) Prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal custody of the child.

*See also In re H.C.*, 7th Dist. Harrison Nos. 13 HA 5 and 13 HA 6, 2013-Ohio-5871, ¶ 32 ("[T]he R.C. 2151.414(D)(2) best interest test requires the court to find permanent custody is in the child's best interest and commit the child to permanent custody of the agency if the four listed conditions are met.").

{¶ 51} R.C. 2151.414(D)(1) and 2151.414(D)(2) are "alternative means" for determining whether permanent custody is in a child's best interest. *In re J.P.*, 10th Dist. Franklin No. 18AP-834, 2019-Ohio-1619, ¶ 39-40 ("In determining the best interest of a child, a juvenile court may apply one of two different tests. Under R.C. 2151.414(D)(1), the juvenile court weighs multiple factors * * * to decide whether granting an agency permanent custody of a child is in that child's best interest. On the other hand, under R.C. 2151.414(D)(2), if the juvenile court makes the four enumerated findings, permanent custody is per se in the child's best interest and the court 'shall' commit the child to the permanent custody of the agency."); *see also In re M.P.*, 10th Dist. Franklin No. 10AP-478, 2010-Ohio-5877, ¶ 35 ("R.C. 2151.414(D)(2) sets forth the circumstances under which a trial court is required to grant permanent custody, while the court employing the factors in R.C. 2151.414(D)(1) considers them to determine whether the best interests of the children are served in granting the permanent custody motion."). Where a juvenile

court determines that permanent custody is in a child's best interest under R.C. 2151.414(D)(1), the court "need not also conduct [a] R.C. 2151.414(D)(2) analysis." *In re J.P.* at ¶ 40, citing *In re T.P.*, 11th Dist. Ashtabula No. 2018-A-0001, 2018-Ohio-1330, ¶ 27-28. If, however, any of the circumstances enumerated in R.C. 2151.414(D)(2) does not exist, then the juvenile court must proceed to a weighing of factors set forth in R.C. 2151.414(D)(1) to determine what is in the child's best interest. *See, e.g., In re K.H.*, 2d Dist. Clark No. 2009-CA-80, 2010-Ohio-1609, ¶ 54.

## C. The Juvenile Court's Best-Interest Determination

{¶ 52} In this case, the juvenile court determined that CCDCFS had proven by clear and convincing evidence that it was in the children's best interest to be placed in the permanent custody of the agency both after weighing the best interest factors specified in R.C. 2151.414(D)(1) and because it found that all the enumerated circumstances specified in R.C. 2151.414(D)(2) existed.

{¶ 53} In its June 23, 2022 journal entries, the juvenile court identified, as to each child, the factors it considered in determining that an award of permanent custody to the agency was in the child's best interest and set forth specific factual findings explaining its evaluation of those factors. With respect to its findings under R.C. 2151.414(D)(1), the juvenile court stated:

> With respect to the best interest of the child, the Court has considered the following factors under O.R.C. 2151.414(D)(1):
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, and foster caregivers and out-of-home providers, and any other person who may significantly affect the child. *The child has a relationship with mother.*

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child. *GAL recommends permanent custody.*

(c) The custodial history of the child, including whether the child has been in temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period. *The child has been in the uninterrupted custody of CCDCFS since January 2020.*

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody. *Child deserves a safe and stable home/environment where her needs can be met and she can thrive. The mother has failed to complete and benefit [from] case plan services that led to the removal of the child. Father has failed to engage in case plan services. No other relative or family member has been identified as willing or appropriate to care for the child.*

(e) Whether any factors in [R.C. 2151.414(E) (7) to (11)] apply in relation to the parents and the child.

(Emphasis sic.)

**{¶ 54}** With respect to its findings under R.C. 2151.414(D)(2), the juvenile court stated:

Additionally, with respect to the best interest of the child, the Court finds that pursuant to O.R.C. 2151.414(D)(2) that all of the following apply:

(a) The Court determines by clear and convincing evidence that one or more of the factors in [R.C. 2151.414(E)] exist and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.

(b) The child has been in the agency's custody for two years or longer, and no longer qualifies for temporary custody pursuant to division (D) of section 2151.415 of the Ohio Revised Code.

(c) The child does not meet the requirements for a planned permanent living arrangement pursuant to division (A)(5) of Section 2151.353 of the Ohio Revised Code.

(d) Prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal [c]ustody.

{¶ 55} In determining that the children could not be placed with one of their parents within a reasonable time or should not be placed with their parents under R.C. 2151.414(D)(2)(a), the juvenile court further found, as to each child, that the following factors set forth in R.C. 2151.414(E) applied:

> The Court finds by clear and convincing evidence that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent, pursuant to O.R.C. 2151.414(E):
>
> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.
>
> (2) The chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent (Mother) that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year.
>
> (4) The parent (Mother and Father) has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.
>
> (14) The parent (Mother and Father) for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

(16) Any other factor the Court finds relevant: Mother has a pending criminal case involving Robbery. Father has a pending criminal case alleging Having Weapons While Under Disability. Father has never made an appearance in court on this case.

{¶ 56} Mother does not specifically challenge any of the particular factual findings made by the juvenile court under R.C. 2151.414(D)(1), (D)(2) or (E). Rather, she argues, generally, that "the record in this case does not contain competent, credible, clear and convincing evidence to support a grant of permanent custody" and that the juvenile court, therefore, abused its discretion in determining that permanent custody was in the children's best interest. Mother contends that because (1) she has a good relationship with the children, (2) she completed most of her case plan services and (3) she was taking steps to address her substance abuse issues and obtain stable housing at the time of the permanent custody hearing, the record did not support a finding, by clear and convincing evidence, that granting permanent custody to the agency was in the children's best interest.

{¶ 57} In support of her argument, Mother points to the fact that the agency had filed a motion to terminate temporary custody in August 2021, stating that she had "completed case plan services" and that "the children should be reunified with her."[6] Although Mother acknowledges the "unfortunate" "change in [her]

_____

[6] As detailed above, it appears that the agency's statement (in its August 2021 motion to terminate temporary custody) that Mother had, at that time, "successfully completed the case plan services," including "substance abuse treatment," was incorrect. House testified that although Mother had completed an assessment, she had not, in fact, completed substance abuse treatment services by August 2021. House indicated that there was "a mix up," that the prior CCDCFS case worker had relied on Mother's self reporting, which turned out to be incorrect, and that the prior CCDCFS case worker later

circumstances in December 2021," she contends that "it was not something that could not be rectified" and that the evidence presented at the permanent custody hearing showed that she was "working hard" to do "exactly that." Mother also points out that, although she was still homeless at the hearing, she had obtained a housing voucher, and that, although she was still testing positive for marijuana, she was actively engaged in substance abuse treatment, "getting really involved with it really deep" within "the last three weeks," and that her marijuana "levels were going down."

{¶ 58} Following a thorough review of the record in this case, we find that competent, credible, clear and convincing evidence supports the juvenile court's findings under R.C. 2151.414(D)(2)(a)-(d) and (E)(1), (2), (4), (14) and (16), mandating a finding that permanent custody was in the children's best interest under R.C. 2151.414(D)(2). Further, even if there had not been sufficient evidence to mandate a finding that permanent custody was in the children's best interest under R.C. 2151.414(D)(2), we cannot say, based on the record before us, that the juvenile court abused its discretion in concluding, based on its weighing of the relevant factors under R.C. 2151.414(D)(1), that an award of permanent custody to the agency was in the children's best interest.

{¶ 59} Although Mother completed certain of the services specified in her case plan — i.e., parenting classes and a mental health and substance abuse

---

"recanted" this statement. No evidence was presented at the permanent custody hearing contradicting House's testimony regarding this issue.

assessment — and claimed to be "working hard" to complete others — i.e., engaging in substance abuse services and obtaining a housing voucher — even "substantial compliance with a case plan" is not, in and of itself, "dispositive" and "does not preclude a grant of permanent custody to a social services agency." *In re J.B.*, 2013-Ohio-1704, at ¶ 90, citing *In re C.C.*, 187 Ohio App.3d 365, 2010-Ohio-780, 932 N.E.2d 360, ¶ 25 (8th Dist.). "'The issue is not whether the parent has substantially complied with the case plan, but whether the parent has substantially remedied the conditions that caused the child's removal.'" *In re J.B.* at ¶ 90, quoting *In re McKenzie*, 9th Dist. Wayne No. 95CA0015, 1995 Ohio App. LEXIS 4618, 11 (Oct. 18, 1995).

{¶ 60} The record reflects that Mother was unable to consistently maintain her sobriety and unable to consistently obtain and maintain suitable and appropriate housing for her children. Although, by the summer of 2021, Mother had made progress on her case plan objectives, it was when she was close to being reunified with her children in the fall of 2021 that Mother's progress derailed — Mother again lost her housing, tested positive for substance use, stopped submitting to urine screens and failed to appear for the hearing on the motion to terminate temporary custody. Although, as of the time of the permanent custody hearing — nearly nine months later and nearly two-and-a-half years after the children had been first placed in agency custody — Mother was, once again, engaging in substance abuse treatment services, she had "a long road" ahead of her. She was still using marijuana (although her "levels" were reportedly declining) and had failed to

comply with repeated agency requests and court orders requiring her to submit to random urine screens and a hair-follicle test. Likewise, although Mother had recently obtained a housing voucher, she had not yet obtained housing, there was no evidence in the record that Mother had taken any steps to seek appropriate housing and, due to her recent felony charges for robbery and theft, she had reportedly become ineligible for CMHA housing and the FrontLine housing program in which she had been participating.

{¶ 61} This is a difficult case. Mother clearly cares for her children and her children care for her. However, in determining what is in a child's best interest, the existence of a biological relationship or even a "good relationship" or "bond" with a parent is not controlling in and of itself. *In re J.B.* at ¶ 111, citing *In re T.W.*, 8th Dist. Cuyahoga Nos. 86084, 86109 and 86110, 2005-Ohio-6633, ¶ 15. "A child's best interests require permanency and a safe and secure environment." *In re E.W.*, 8th Dist. Cuyahoga Nos. 100473 and 100474, 2014-Ohio-2534, ¶ 29. Although "[f]amily unity and blood relationship are vital factors to carefully and fully consider," the "paramount consideration" is always the best interest of the child. *In re J.B.* at ¶ 111. While Mother loves her children, has visited with them regularly and has a "good bond" with them, two-and-a-half years after the children were removed from her care, Mother continues to struggle with substance use, has not completed a treatment program and is unable to provide stable, appropriate housing for her children. Further, there is nothing in the record to indicate that Mother would be

able to consistently meet her children's basic needs at any reasonable time in the future.

{¶ 62} Following a thorough review of the record, we find that competent, credible, clear and convincing evidence presented at the permanent custody hearing supports the juvenile court's findings under R.C. 2151.414(B)(1), (D)(1)-(2) and (E). We cannot say that the juvenile court erred or abused its discretion in determining that an award of permanent custody to CCDCFS was in Ran.D. and Rai.D.'s best interest.

{¶ 63} Mother's assignment of error is overruled.

{¶ 64} Judgment affirmed.

It is ordered that the appellee recover from the appellant the costs herein taxed.

The court finds that there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Court of Common Pleas, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

FRANK DANIEL CELEBREZZE, III, P.J., and
MARY EILEEN KILBANE, J., CONCUR