[Cite as *In re Za.S.*, 2023-Ohio-1477.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE ZA.S., ET AL.                    :
                                       :                No. 111683
Minor Children                         :
                                       :
[Appeal by J.S.,Father]                :

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 4, 2023

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-19-912434 and AD-19-912435

*Appearances:*

Edward F. Borkowski, Jr., *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee.*

MARY J. BOYLE, J.:

{¶ 1} Appellant, J.S., ("Father"), asks us to determine whether the trial court abused its discretion in awarding permanent custody of Za.S. (d.o.b. 02/27/14) and Zan.S. (d.o.b. 05/30/15) (collectively "Children") to the Cuyahoga County Department of Children and Family Services ("CCDCFS"). Father maintains

that the trial court abused its discretion by granting permanent custody to CCDCFS.[1] For the reasons set forth below, we affirm the juvenile court's judgment.

## I.          Facts and Procedural History

{¶ 2}    Children have a long history with CCDCFS.  Legal custody was previously awarded to Children's older sister ("Legal Custodian") in July 2017 due to their parents' struggles with substance abuse and domestic violence.  The cases involving this appeal[2] result from a CCDCFS referral that Legal Custodian was "overwhelmed with the children's [sexualized, aggressive, and violent] behaviors" and "expressed a financial inability to care for the children."  (Oct. 24, 2019, tr. 11-12.)  Legal Custodian was also facing an eviction.  After CCDCFS believed it could no longer preserve Children's placement with Legal Custodian, CCDCFS filed a complaint for dependency and temporary custody as well as a motion for pre-dispositional temporary custody in October 2019.

{¶ 3}    A hearing on CCDCFS's motion was held later that month.[3]  The short-term service worker assigned to the case, Averi Anderson ("Service Worker"), testified that Children's mother and Father remained "inappropriate caregivers."

---

[1] This appeal addresses the parental rights and responsibilities of Father only.  To date, no appeal had been filed by Children's mother.

[2] Children's cases and the filings and proceedings therein were often intertwined with those of their two half-siblings, who were born to Children's mother and unrelated to Father.  The instant appeal does not involve Children's half-siblings or the trial court's disposition of their respective cases.

[3] The trial magistrate presided over Children's cases until they were transferred to the trial judge's docket in July 2021.

(Oct. 24, 2019, tr. 15.) Service Worker provided the following basis for CCDCFS's belief that Father was an inappropriate caregiver at that time:

> [W]e did discover that he had not established paternity and this was also a concern in the past where that was a goal on the case plan that was not met. He also — we have a concern for the parents' history of domestic violence between each other.
>
> And so he expressed that he, himself still struggles with anger management and that he could benefit from some anger management. He also — we weren't previously aware that mother was residing with him and once that information came out he did express some fear of that leading to a domestic violence altercation or police involvement. So our concern is due to their history of violence together with mom living with him if he were to get custody, obviously the children would still be or mom would still be allowed access to the children.

(Oct. 24, 2019, tr. 16-17.)

{¶ 4} Service Worker also testified that Legal Custodian and a sex abuse supervisor recommended Children be placed in separate foster homes due to behavioral concerns. Ultimately, CCDCFS's motion was granted, and Children were committed to the emergency temporary care and custody of CCDCFS. Children were placed in shelter care until the dispositional hearing addressing CCDCFS's complaint for dependency and temporary custody. The magistrate's pretrial order journalized that same day noted that Father would be referred for another anger management program as well as an alcohol and substance abuse assessment. The court order also required Father to establish paternity.

{¶ 5} A case plan was subsequently filed in November 2019. With regard to Father, the plan noted, "Children are at risk of abuse due to parent's lack of parenting knowledge, parenting skills, and concerns with anger management which

father admitted to." The case plan further noted, "Father has a history of substance use, specifically alcohol which interfered with his ability to meet the children's basic, emotional, and safety needs. It has been recently reported that he continues to use alcohol which has impaired his ability to assure child safety." Father was to:

- Work with caseworkers and service providers to develop a network of emotional support for Children;

- Complete a drug and alcohol assessment;

- Attend, participate in, and complete a parenting program and any recommended substance abuse treatment and/or aftercare;

- Provide scheduled and random drug screens;

- Follow any other recommendations of his substance abuse assessor or treatment provider;

- Discuss newly learned parenting skills with caseworkers and demonstrate them during interactions with Children;

- Sign a release of information;

- Cooperate with caseworkers in scheduling family meetings; and

- Find and utilize non-using supports and other outlets to relieve stress.

Nothing in the case plan, however, required Father's paternity to be established.

{¶ 6} In December 2019, CCDCFS filed an amended complaint and the matter proceeded to trial. Testimony was offered by a CCDCFS social worker that Legal Custodian "stated she does not want to participate in services and she does not want to be reunified." (Dec. 11, 2019, Disposition tr. 12.) Service Worker testified as follows regarding Father's paternity: "To my knowledge, [J.S.] is the alleged father for both children, but paternity has not been established yet." (Dec. 11, 2019,

Adjudication tr. 11-12.) The parties stipulated to the allegations of the amended complaint and Children being committed to the temporary custody of CCDCFS. Children's mother and Father also stipulated to the case plan. Children were adjudicated dependent and committed to the temporary custody of CCDCFS in a judgment entry journalized January 3, 2020. The permanency plan of reunification was approved as well as the case plan. The juvenile court noted that Father was referred to recovery resources and "[c]ase plan objectives for the father are paternity establishment and substance abuse assessment with recommendations." (Judgment Entry, Jan. 3, 2020.)

{¶ 7} A second case plan was filed in January 2020. Father's objectives were the same as the first case plan filed in November 2019. A semiannual administrative review report ("SARR") was also filed in January. The report stated that Father was in parenting classes and completed a domestic violence program. Father had not signed up for alcohol and substance abuse classes due to financial concerns. The report further stated that Father visited with Children and there were no concerns regarding his visits. The report noted that Children's mother and Father continued working toward reunification and Children were doing "very well" in their placement at separate foster homes.

{¶ 8} In April 2020, CCDCFS filed a motion to modify temporary custody to legal custody "to [F]ather," without protective supervision. The motion stated legal custody was in the best interest of Children and provided the following update regarding Father's progress:

> CCDCFS referred father to parenting classes, anger management, and substance abuse treatment. Father has been compliant with all services offered and has maintained his sobriety. Father is able to provide for the needs of the children on a daily basis and is willing to provide a permanent home for the children.

(Motion, Apr. 24, 2020.)

{¶ 9} A hearing on CCDCFS's motion was scheduled for July 2020. The matter was continued until September 2020 at the request of counsel for Children's mother and Father because they were unable to access the Zoom meeting. A SARR filed in August 2020 noted that Children had been placed in the care and custody of Father and would remain with him pending the September hearing. That hearing was continued to December 2020 at the request of the parties.

{¶ 10} A third case plan was filed in October 2020. The plan provided the following update:

> The children are with their biological father. [Father] has completed case plan services and provides and supports more than basic needs for the children. * * * [T]he father participates in his case plan goals and engages with the neighborhood collaborative. * * * [T]he father supports visits with the children's mother.

(Case Plan, Oct. 30, 2020.) The amended case plan was approved by the juvenile court in November 2020.

{¶ 11} The December 2020 hearing on CCDCFS's motion to modify temporary custody to legal custody to Father was continued until February 2021 at the request of counsel for Children's mother in order for discovery to be completed. CCDCFS noted on the record, "The children are safe where they are right now.

[Children] are actually with [F]ather. So they are safe with him. * * * So the children are thriving." (Dec. 14, 2020, tr. 7.)

{¶ 12} The February 2021 hearing on CCDCFS's motion to modify temporary custody to legal custody to Father was cancelled and, in March 2021, CCDCFS filed a motion to modify temporary custody to permanent custody. The affidavit of the assigned social worker of record, Virginia Granc ("Social Worker"), included numerous attestations against Children's mother and the following against Father:

> 11. A case plan was filed with [j]uvenile court and approved which requires alleged father [J.S.] to complete parenting education, complete substance abuse assessment and follow the recommendations, complete random urine screens, and obtain stable and appropriate housing.
>
> 12. The children were placed with [Father] from May[ ] 2020 until March 3, 2021. They were removed due to physical injuries sustained by Za.S. while with [Father].
>
> 13. [Father] participated in parenting education however he has failed to benefit from the service. While in his care, he allowed the children to have unsupervised overnight visits with mother. He also permitted the children to be cared for by inappropriate caregivers.
>
> 14. While in [Father]'s care the children failed to attend school on a regular basis.
>
> 15. [Father] completed a substance abuse assessment and treatment. However, he relapsed in December[ ] 2020[ ] and refuses to re-engage in services or provide random screens.

(Motion, Mar. 9, 2021.) Social worker further attested: "Alleged Father, John Doe, has failed to make himself available for case plan services and has abandoned the

child." (Motion, Mar. 9, 2021.) An affidavit for publication on John Doe was also attached to CCDCFS's motion.

{¶ 13} A hearing on the motion was scheduled for March 2021. However, the juvenile court found that the "matter must be rescheduled for further hearing [in April 2021] because [CCDCFS] failed to timely file a post dispositional motion." (Magistrate's order, Mar. 12, 2021.) CCDCFS subsequently filed a notice of withdrawal of its pending motion to modify temporary custody to legal custody to Father. The juvenile court withdrew said motion on March 22, 2021. The hearing in April 2021 was continued to May 2021 due to ongoing discovery and imperfect service. Children's mother and Father entered denials of CCDCFS's motion for permanent custody.

{¶ 14} A final pretrial hearing was held in May 2021. The trial court reviewed the status of the case and found the matter must be scheduled for a subsequent final pretrial hearing in June 2021 because CCDCFS had not perfected service on all parties. The matter was again continued in June due to imperfect service; another final pretrial was scheduled for July 2021.

{¶ 15} A fourth case plan was filed in May 2021. The plan was updated because "[C]hildren need a change in placement due to [their] overall behaviors which include sexual behaviors [they] are performing on each other. The children cannot remain in the same foster home." (Case Plan, May 13, 2021.)

{¶ 16} A SARR dated January 5, 2021, but not filed until June 2021, provided some insight into Children's lives while in Father's care. The report

indicated Children were in school and daycare and up to date medically with future appointments scheduled. It also noted, "Father is working to get [Children] motivated and staying on task with school work." (SARR, June 23, 2021.) The report further indicated that, as of January 2021, CCDCFS planned to continue seeking Father's legal custody.

{¶ 17} A SARR dated June 24, 2021, was filed in July 2021. The report indicated that Children's needs were met in their separate foster homes and that they were engaged in school and counseling appointments. The report noted that the Children's separate placement was needed due to "behavior issues between them." (SARR, July 20, 2021.) The report further noted that "[t]he parents [were] not visiting on a consistent basis" but Father and Children had "good interactions on virtual visits." (SARR, July 20, 2021.) The report raised concerns regarding Father's history of substance abuse:

> It has recently been reported that [Father] continues to use alcohol which has impaired his ability to assure child safety. * * * [Father] continues to drink alcohol and use illegal substances. During a recent staffing [Father] refused to engage in services and complete a urine screen for [CCDCFS].
>
> * * *
>
> [Father] tested positive for marijuana in his hair and urine and admits to using marijuana. [Father] provided a [CCDCFS] with a copy of his medical marijuana card. During a recent home visit [CCDCFS] noticed that there w[ere] beer cans in the refrigerator to which he denies the cans belong to him. [Father] does not recognize the need to protect his children from harm.

(SARR, July 20, 2021.) The report also questioned Father's parenting abilities:

Although [Father and Children's mother] completed parenting classes through Beechbrook they are unable to demonstrate the knowledge they received. [Children] were not attending school on a regular basis [and there] were concerns of physical abuse and possible sexual abuse while they were placed with the father.

(SARR, July 20, 2021.)

{¶ 18} In July 2021, Father filed a pro se motion for dismissal, alleging judicial and prosecutorial misconduct. A pretrial was held almost two weeks later and Father failed to appear. The matter was then transferred to the judge's docket, and trial on CCDCFS's motion to modify temporary custody to permanent custody was set for September 2021.

{¶ 19} One week before the September 2021 trial, Children's guardian ad litem ("GAL") filed a motion requesting separate counsel for Children since a potential conflict may exist. GAL also requested the trial be continued. The motion was granted, and separate counsel was appointed. An attorney telephone conference was to take place in lieu of trial. Following the September attorney telephone conference, the juvenile court issued an entry continuing the trial to December 2021. The December trial was rescheduled as an attorney telephone conference, and the trial was again continued to January 2022.

{¶ 20} A SARR from December 2021 and filed in January 2022 indicated that Father continued to "drink heavily" and use marijuana to alleviate stress: "[Father] has completed drug screens for CCDCFS. They have been positive. He minimizes [his] substance use and states that he has used it to cope with pain and stress. He says that he has a medical marijuana card. There are concerns he has

anger outbursts when he abuses alcohol." (SARR, Jan. 10, 2022.) Because of this, concerns remained regarding his ability to meet the children's basic needs: "While the father is using substances[,] he is unable to control his overall anger and will become violent towards them. The children display their emotions in angry outbursts." (SARR, Jan. 10, 2022.) The report further stated:

> Children are at risk of abuse due to parent's lack of parenting knowledge, parenting skills, and concerns with anger management which father admitted to. * * * Parents have not engaged with anger management and do not believe themselves to be in need of such.
>
> * * *
>
> The parents deny they have anger management problems and deny they abused the children. Although the children have stated otherwise. One of the children has old burn marks on his back and is unable to explain to [CCDCFS] what happened to him. The parents believe the only way to reprimand a child is to hit them with belts and other objects when they do not listen.

(SARR, Jan. 10, 2022.)

{¶ 21} According to the GAL's report filed January 12, 2022, Children were placed in separate foster homes and presented "behavioral challenges":

> During my visits with the children over the course of this case they have been extremely active and sometimes difficult to manage. Due to their age I do not believe they have the ability to determine what is in their best interest. I believe they have a bond with [Father]. I believe they both love their parents. Both children are having their medical and educational needs met by the foster parents.

(GAL Report, Jan. 12, 2022.) After a video visit with Father and Children, the GAL "had concerns that the father could control these children for an extended period of time." (GAL Report, Jan. 12, 2022.) Ultimately, the GAL believed CCDCFS's

permanent custody of Children was in their best interest, noting "[t]he children have been in [CCDCFS] custody for quite some time. The children deserve some permanency in their lives." (GAL Report, Jan. 12, 2022.)

{¶ 22} The January 2022 trial was rescheduled as an attorney telephone conference. However, a hearing took place and testimony was heard. The same journal entry was filed in each of the Children's respective cases following the conference. The entries stated, "[T]he Court heard testimony as it relates to reasonable efforts. The Court finds that [Children's] continued residence in or return to the home of [their mother] will be contrary to [Children's] best interest." (Journal Entry, Jan. 21, 2022, and Jan. 24, 2022.) The court found CCDCFS made reasonable efforts to prevent removal of Children, eliminate the continued removal of Children from their mother's home, or to make it possible for Children to return home. These entries were later amended to include a finding that CCDCFS made reasonable efforts to finalize the permanency plan.[4] The entries made the following findings of fact regarding Father:

> [J.S.], Alleged Father, was offered services of parenting, substance abuse, completed random urine screens and obtained stable and

---

[4] On May 10, 2022, CCDCFS filed a motion to create audio transcripts of the January 2022 proceeding. The motion stated that the journal entries that followed did not state that CCDCFS made reasonable efforts to finalize the permanency plan. The hearing's audio transcript was needed so it could be determined whether the appropriate finding was made. The motion was granted in an entry journalized May 23, 2022. CCDCFS filed a motion for nunc pro tunc order on June 2, 2022. CCDCFS claimed that while the January entries did not state that CCDCFS made reasonable efforts to finalize the permanency plan, the juvenile court judge did make such a statement on the record. On June 15, 2022, the court granted the motion and amended the entry. The transcript of the January 2022 hearing has not been provided to this court, nor were any issues with the nunc pro tunc entry raised on appeal. Therefore, we presume regularity.

appropriate housing.  He participated in parenting education but did not benefit from the service.  He refuses to engage in substance abuse services and to provide random urine screens.

(Journal Entry, Jan. 24, 2022.)  The permanency plan of reunification was approved and the trial was continued to March 2022.

{¶ 23} An updated case plan filed in February 2022 indicated that Children's providers were no longer able to provide care and a change in placement was needed.  The March 2022 trial was continued to May 11, 2022.[5]

{¶ 24} At trial, testimony was offered by Social Worker, CCDCFS child protection specialist, Lena Oates ("Child Protection Specialist"), and Children's GAL.  Social Worker testified that Father was the "father or alleged father" of Children and paternity had been established for Za.S. but not for Zan.S.  (May 11, 2022, tr. 16.)  Child Protection Specialist confirmed Father had not established paternity for both Children.  However, Child Protection Specialist testified there was "not [any real dispute as to who the father is for [Zan.S.] from [CCDCFS] nor ha[d] mom presented any other alleged fathers for him."  (May 11, 2022, tr. 128.)  Father also did not dispute he was the father of Zan.S.  Child Protection Specialist never walked Father through the process of establishing paternity.

{¶ 25} Social Worker testified that Children were placed with Father for about one year beginning in May 2020.  Social Worker acknowledged that Children were happy while in Father's care.  Social Worker further testified that Father

---

[5] The trial involved Children as well as two other half-siblings of Children with whom Father is unrelated.

worked several jobs to provide for Children's basic needs. However, Children were removed in March 2021 to due several concerns.

{¶ 26} Social Worker stated that one concern was physical abuse. This concern arose from burn marks on Children's backs and scratch marks on their stomachs. One child also had a scar on his cheek, underneath his hairline, and forehead. Social worker testified that none of the injuries existed prior to Children's placement with Father. On cross-examination, Social Worker acknowledged there were concerns in January 2021 regarding some of the burn marks on Zan.S., but CCDCFS did not remove Children from Father's care at that time.

{¶ 27} Social Worker testified that there were also concerns regarding sexual abuse because Children were acting sexually with each other. On cross-examination, Social Worker explained that one allegation of sexual abuse arose from the daycare Children attended, which was operated by one of Father's relatives. Social Worker agreed that Children were in CCDCFS's custody at the time of their placement with Father and, therefore, CCDCFS approved this daycare provider. Social Worker explained that there were also concerns regarding two family members that Children were left alone with: "The boys detailed the sexual acts they were watching these older males do with other females in the home." (May 11, 2022, tr. 53.)

{¶ 28} Social Worker further testified that there were concerns that Father left Children with inappropriate caregivers, like the relatives mentioned above. Child Protection Specialist explained, "There has been [CCDCFS] concern for

decisions that [Father] has made as the primary caregiver for his children, specifically, the caregivers that he has picked, the allegations of abuse that has occurred while the children were in his custody." (May 11, 2020, tr. 96.) Social Worker also explained that Father would allow Children's mother to have unauthorized and unsupervised access to the Children. Social Worker acknowledged that the visitations did not continue once she explained to Father that they were inappropriate.

{¶ 29} Social Worker further testified that Children were not attending school on a regular basis while they were placed with Father. Za.S.'s school records revealed "an excessive number of absences" while Zan.S.'s showed "a number of unexcused absences." (May 11, 2022, tr. 55.)

{¶ 30} Social worker testified that Father finished a parenting program in April 2020 and all of the concerns raised above occurred after Father had completed the classes. Therefore, both Social Worker and Child Protection Specialist did not believe Father had benefited from parenting service. Social Worker testified that Father had not reengaged in these services to her knowledge.

{¶ 31} Social Worker further testified that Father completed a substance abuse assessment and subsequent treatment; however, there were concerns that he did not benefit from these services either because subsequent drugs screens yielded positive results. Social Worker indicated that Father tested positive for marijuana in December 2020 and March 2021 and positive for cocaine in January 2022. Social Worker advised that Father was inconsistent with his drug screens and did not

complete them on a monthly basis as was required. Child Protection Specialist testified that the January 2022 drug screen was the last submitted to by Father and CCDCFS had no documented sobriety for him. Social Worker testified that she attempted to re-refer him to substance abuse treatment after he relapsed, but Father claimed he had a medical marijuana card, a copy of which he failed to provide to Social Worker. Both Social Worker and Child Protection Specialist testified that Father did not reengage in substance abuse services. On cross-examination, Social Worker testified that Children were placed with Father despite prior inconsistencies with drugs screens and CCDCFS's knowledge of his marijuana use both before and during Children's placement with him. Social Worker further acknowledged an appropriate medical marijuana card would satisfy one of CCDCFS's concerns.

{¶ 32} Child Protection Specialist also advised that were domestic violence concerns stemming from an altercation in 2017 that resulted in a current, open, and active warrant for Father for domestic violence and child endangering charges. On cross-examination, Child Protection Specialist acknowledged CCDCFS was aware of this allegation at the time it placed Children with Father and CCDCFS was unaware of any subsequent allegations.

{¶ 33} Social Worker and Child Protection Specialist testified that after Children were removed from Father's care, they were placed together but had to be separated due to their sexualized and aggressive behaviors with one another. Child Protection Specialist explained that Za.S. was placed with his current foster parents in February 2022 while Zan.S. was placed with his current foster parent in March

2022. She advised these foster homes were "appropriate" and "adoptive." (May 11, 2022, tr. 127-128.) Child Protection Specialist indicated both Children's behaviors had "absolutely" improved since being placed in separate foster homes. (May 11, 2022, tr. 99.) Both Social Worker and Child Protection Specialist noted CCDCFS facilitated visitation between Children. Child Protection Specialist indicated both Children were bonded with their foster parents and involved in counseling. Concerns regarding the Children in school had resolved and Children's basic needs were being met. In summation, Child Protection Specialist stated, "Everything seems to be going quite well in both homes." (May 11, 2022, tr. 103.)

{¶ 34} Social Worker acknowledged Father visited with Children on a consistent basis. However, she testified "the parents [did not] demonstrate[ ] that they were able to provide stability and permanency for the children" and Father did not adequately address his substance abuse or demonstrate his parenting abilities. (May 11, 2022, tr. 61.)

{¶ 35} Child Protection Specialist also acknowledged on cross-examination that Father was employed and there were no concerns that Father would be unable to pay his rent or financially meet Children's basic needs. She further acknowledged that she never had any issues getting in contact with Father and he fully engaged in virtual visits with Children:

> [Father] is awesome with his children. He fully engaged with them. He has been fully engaged with [CCDCFS]. I don't have any problems communicating with him expressing [CCDCFS] concerns, getting feedback from him, so he — there's no problems at the visit except a small thing. Sometimes he's technology inclined. But that's not an

issue.  He shows up every weekend — every week — excuse me — regardless of that.

(May 11, 2022, tr. 117.)  Child Protection Specialist also testified that Father was a "father figure for all of the kids" involved in the permanent custody proceeding and cared for and visited with them too:

> The children enjoy seeing [Father]  He has been the only parent present during my assignment on the case.  And I know you're asking me about [Za.S. and Zan.S.], but all the children know [Father], reference to him, defer to him, and expect to see him on weekly visits.

(May 11, 2022, tr. 118.)  She advised that Children have never expressed any concerns to her about living with Father and they consistently want to go "with their father."  (May 11, 2022, tr. 119.)

{¶ 36} Nonetheless, Child Protection Specialist explained:

> The concern with parenting, I guess what I would say is [Father] is in need of support, which is not a crime, however, his — the support that he has available to him has been his adult siblings and other relatives. Unfortunately, we have negative history associated with those individuals.

(May 11, 2020, tr. 119.)  She acknowledged that Father listened to CCDCFS about these concerns:  "We've had conversations.  I don't have any problem relaying [CCDCFS's] position to [Father] and him respectfully sharing his thoughts and opinions."  (May 11, 2020, tr. 120.)  Child Protection Specialist testified that CCDCFS tried to "fix or fill in the gaps" of family support:

> [Father] was referred to supportive services where he was engaged with — I don't know what they call them specifically — someone to provide family support.

> [Father], I remember there was some engagement concerns, COVID, but he was positively connected. There was a male worker. There were a lot of sessions that were missed during that time. [Father] was explaining to the provider his barrier was schedule-wise, but ultimately, the service had to discontinue due to [Father] not engaging.

(May 11, 2020, tr. 123.) She advised "because that service wasn't completed, it's hard for [CCDCFS] to say that [Father] has other supports of the ability or willingness to utilize others." (May 11, 2020, tr. 123.) Child Protection Specialist further explained:

> And so what [CCDCFS]'s concern was was [sic] that [Father], period, needs support with his children. Not necessarily financial, but getting them to follow his directives, daily tasks type or deal. So that particular provider was supposed to work with [Father] to instill those skills with him or maybe make other suggestions with how to deal with [Children] so that maybe he wouldn't have to rely on relatives or other individuals.

(May 11, 2020, tr. 124.) Ultimately, she opined:

> Permanent custody is in the best interest of the children at this time because either identified parents are unable to meet the children's basic and specialized needs. All four of the children have mental health needs that need to be addressed and absolutely needs to have basic needs met. Right now where the children are placed, all those needs are being met. Mom has failed to engage with children. [Father] does engage with his children, but [CCDCFS] does find that he needs more support, more help, to meet the children's basic needs. * * * So with that being said, permanent custody is the only option for these children at this time.

(May 11, 2022, tr. 107-108.)

{¶ 37} Lastly, GAL acknowledged Children never relayed any concerns to him about being with Father and testified:

> The children have always had a bond to [Father] in this case. He's been a concerned father.

The problem with this case is that this is — the case has dragged for so long that the children, over a period of time, have been inconsistent with whether to go home or not. In particular to the mother, not as to [Father].

At some point, I asked the Court to appoint special counsel for the children because of the potential conflict, which they did.

My concern at this time was that the parents had still been inconsistent in completing the case plan elements, that they have been given an opportunity to do so and they haven't.

The children, obviously need some permanency in their life.

They each in their own way have issues.

* * *

The two middle children have always been quite active. It's always clear that they have a connection with [Father]. And he has contacted me on occasions when there has been situations where he didn't feel he was getting his visitation, and, you know, I directed him on occasions to contact his attorney and also the social worker.

(May 11, 2022, tr. 136-137.) However, he ultimately opined:

But having said all that, it's still my opinion, at this point, the parents have not completed their case plan elements, that this case has been going on for so long that the children need some permanency in their life, so unfortunately, I would stick by my recommendation of permanent custody being in their best interest at this time.

(May 11, 2022, tr. 136-137.)

{¶ 38} CCDCFS entered 25 exhibits without objection from any of the parties which included certified copies of a complaint, a magistrate's decision, and eight journal entries evidencing the history of Children and Children's mother and half-siblings with CCDCFS; certified copies of two criminal indictments and plea and sentencing journal entries associated with prior domestic violence incidents

between Children's mother and the father of one of Children's half-siblings; certified medical records for Father establishing the results of his drug screens; certified medical records from examinations of Children; photographs of Children depicting scars on their bodies; and authenticated school attendance reports for Children.

{¶ 39} The trial judge advised Father that "these cases would be easy if it was — if my decision was what's in your best interest or what's in the parent's best interest, but it's not." (May 11, 2002, tr. 156.) The trial judge further advised, "I will render my decision by way of written entry once I take a look at everything because I believe I owe it to these four children." (May 11, 2002, tr. 156.)

{¶ 40} Just shy of two weeks later, journal entries granting CCDCFS's motion for permanent custody were filed in each of Children's cases. The trial court referred to J.S. as "father" in the case involving Za.S. and "alleged father" in the case of Zan.S.[6] The juvenile court made the following findings in each entry:

> The child has been in temporary custody of [CCDCFS] which is for twelve (12) or more months of a consecutive twenty-two (22) month period. The child has been in temporary custody since January 3, 2020.
>
> * * *
>
> Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by [CCDCFS] to assist parents to remedy the problems that initially caused the child to be placed outside the home, the mother, [Father], and legal custodian have failed to continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.

---

[6] Quotes from these entries are modified to reference "father" or "alleged father" as "Father."

(Journal Entries, May 23, 2022.) The juvenile court also made the following findings of fact regarding Father:

> Mother and [Father] have neglected the child between the date of the original complaint was filed and the date of the filing of this Motion by failure to regularly visit, communicate, or support the child.
>
> Mother and [Father] have demonstrated a lack of commitment toward the child by failing to support, visit, or communicate with child when able to do so, or by other actions, have shown an unwillingness to provide an adequate, permanent home for the child.
>
> [Father] has a chemical dependency that is so severe that it makes the parent unable to provide an adequate, permanent home for the child at the present time and, as anticipated, within one (1) year after the Court hold the hearing in this matter.
>
> [Father] is unwilling to provide drug screens to ensure his sobriety.
>
> While in custody of [Father], [the child or] alleged sibling of the child suffered bruises and numerous cigarette burns.

(Journal Entries, May 23, 2022.) In finding the allegations made in CCDCFS's motion were proven by clear and convincing evidence and granting permanent custody to CCDCFS, the juvenile court stated:

> Upon considering the interaction and interrelationship of the child with child's parents, siblings, relatives, and foster parents; the wishes of the child; the custodial history of the child * * *; the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody; and the report of the [GAL], the Court finds by clear and convincing evidence that a grant of permanent custody in in the best interests of the child and the child cannot be placed with one (1) of the child's parents within a reasonable time or should not be placed with either parent.

(Journal Entries, May 23, 2022.)  The juvenile court approved the permanency and amended case plan and found:

> [R]easonable efforts were made to prevent the removal of the child from his home, or return the child to the home, and to finalize the permanency plan, to wit: reunification.  * * * Services [provided to Father] include substance abuse, mental health, and parenting. Alleged father did not establish paternity and did not benefit from services. * * * Child receives individual counseling.

(Journal Entries, May 23, 2022.)  Accordingly, the order committing Children to the temporary custody of CCDCFS was terminated, Children were committed to the permanent custody of CCDCFS, and all parental rights and responsibilities were terminated.

{¶ 41} Father now appeals, raising the following assignment of error for review:

> **Assignment of Error**:  The trial court abused its discretion by granting permanent custody of [Father]'s children to CCDCFS against the manifest weight of the evidence.

## II.      Law and Analysis

### A.      Standing

{¶ 42} As an initial matter, we note that while Father established paternity for Za.S., paternity was not established for Zan.S. at the time of the May 2022 permanent custody hearing.  However, the establishment of paternity was not included as an objective in Father's case plan and CCDCFS, Father, and Children's mother never disputed that Father was Zan.S.'s parent.  Nor was the issue of standing raised by either party in the briefing.  For the purposes of this appeal, we

will assume that Father has standing to assert parental rights with respect to both children and challenge the trial court's custody determination. *See In re O.A.*, 9th Dist. Summit Nos. 30449 and 30451, 2023-Ohio-791, ¶ 6; *In re M.S.*, 8th Dist. Cuyahoga No. 108445, 2019-Ohio-4168, ¶ 10-12; *In re R.G.*, 8th Dist. Cuyahoga No. 104434, 2016-Ohio-7897 (reviewing assignments of error of putative father who failed to establish paternity despite it being included in case plan).

**B.       Permanent Custody Determination**

{¶ 43} In his sole assignment of error, Father argues that the trial court abused its discretion by granting permanent custody of Children to CCDCFS.

{¶ 44} Both the U.S. and Ohio Supreme Courts recognize that parents have a basic and fundamental interest in the care, custody, and management of their children. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990); *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 28.   Parental rights, however, are not absolute, and a parent's natural rights are always subject to the ultimate welfare of the child. *In re K.M.*, 10th Dist. Franklin Nos. 15AP-64 and 15AP-66, 2015-Ohio-4682, ¶ 15, citing *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).   Therefore, the "[t]ermination of parental rights is an alternative of last resort but is sanctioned when necessary for the welfare of a child." *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, ¶ 7, citing *In re Wise*, 96 Ohio App.3d 619, 624, 645 N.E.2d 812 (9th Dist.1994).   By terminating parental rights, the goal is to create a more stable life for dependent

children and to facilitate adoption to foster permanency for children. *In re L.W.*, 8th Dist. Cuyahoga No. 104881, 2017-Ohio-657, ¶ 21, quoting *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 67.

{¶ 45} The termination of parental rights is governed by R.C. 2151.414 and determined by the two-prong test set forth therein. *In re J.C-A.*, 8th Dist. Cuyahoga No. 109480, 2020-Ohio-5336, ¶ 78, citing *In re M.H.*, 8th Dist. Cuyahoga No. 80620, 2002-Ohio-2968, ¶ 22. Before a court may terminate parental rights and award permanent custody of a child to the proper agency, it must determine by clear and convincing evidence that (1) one of the factors enumerated in R.C. 2151.414(B)(1)(a)-(e) applies, and (2) an award of permanent custody is in the child's best interest. R.C. 2151.414(B).

{¶ 46} "'Clear and convincing evidence' is evidence that 'will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established.'" *In re C.B.*, 8th Dist. Cuyahoga No. 92775, 2011-Ohio-5491, ¶ 28, quoting *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954). "Where clear and convincing proof is required at trial, a reviewing court will examine the record to determine whether the trier of fact had sufficient evidence before it to satisfy the requisite degree of proof." *In re T.S.*, 8th Dist. Cuyahoga No. 92816, 2009-Ohio-5496, ¶ 24, citing *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990).

{¶ 47} When reviewing a juvenile court's judgment in child custody cases, the Ohio Supreme Court has stated that the "court's decision in a custody proceeding is subject to reversal only upon a showing of abuse of discretion." *In re A.J.*, 148

Ohio St.3d 218, 2016-Ohio-8196, 69 N.E.3d 733, ¶ 27, citing *Davis v. Flickinger*, 77 Ohio St.3d 415, 417, 674 N.E.2d 1159 (1997). "'An appellate court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence.'" *In re J.M-R.*, 8th Dist. Cuyahoga No. 98902, 2013-Ohio-1560, ¶ 28, quoting *In re Jacobs*, 11th Dist. Geauga No. 99-G- 2231, 2000 Ohio App. LEXIS 3859, 11 (Aug. 25, 2000), citing *In re Taylor*, 11th Dist. Ashtabula No. 97-A-0046, 1999 Ohio App. LEXIS 2620 (June 11, 1999). *See In re AR.S.*, 2021-Ohio-1958, 174 N.E.3d 28 (8th Dist.).

### 1.    The First Prong:  R.C. 2151.414(B)(1)(a)-(e) Factors

{¶ 48} Pursuant to R.C. 2151.414(B)(1):

[T]he court may grant permanent custody of a child to a movant if the court determines at the hearing * * *, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that *any* of the following apply:

(a) The child is not abandoned or orphaned [or] has not been in the temporary custody of one or more public services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

(Emphasis added.) "*Only one* of the factors must be present to satisfy the first prong of the two-part analysis for granting permanent custody to an agency." (Emphasis added.) *In re D.H.*, 8th Dist. Cuyahoga No. 110505, 2021-Ohio-3821, ¶ 27, citing *In re L.W.*, 8th Dist. Cuyahoga No. 107708, 2017-Ohio-657.

{¶ 49} Here, Father claims the trial court erred in finding by clear and convincing evidence that permanent custody was in Children's best interest. Father asserts he is dedicated and bonded to Children; he remedied the conditions that caused Children to be removed from their parent's custody; he is able to meet Children's basic needs and provide a safe, stable environment for them; his substance use does not affect his ability to care for Children; he made progress with respect to the case plan; Children were placed with him for the better part of a year during which time he worked multiple jobs to provide for them; and he fully engaged in visitation after Children were removed. Father further asserts that there was a lack of evidence establishing any alleged chemical dependency, that his substance use impaired his parenting abilities, or that Children's injuries resulted from abuse at his hands.

{¶ 50} CCDCFS argues that the trial court's findings are supported by the competent, credible evidence in the record. CCDCFS maintains that "[m]uch of Father's focus in on the trial court's findings pursuant to R.C. 2151.414(E), which

findings were not required for purposes of the first prong of the permanent custody statute given the unchallenged '12 of 22 months' finding made pursuant to R.C. 2151.414(B)(1)(d)."

{¶ 51} Here, the trial court found that Children were in the temporary custody of CCDCFS since January 3, 2020. The record clearly and convincingly supports the trial court's finding under R.C. 2151.414(B)(1)(d) that Children were in the temporary custody of a public children services agency for 12 or more months of a consecutive 22-month period. Father does not dispute this finding. Because the first prong of the two-part analysis for granting permanent custody to CCDCFS is satisfied, we do not need to address Father's arguments that the record does not support the trial court's findings under R.C. 2151.414(E).

### 2. The Second Prong: Children's Best Interest Factors

{¶ 52} In determining the best interest of a child, the juvenile court must consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1).

{¶ 53} Although a trial court is required to consider each relevant factor under R.C. 2151.414(D)(1) in deciding to award permanent custody, "[t]here is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. The Ohio Supreme Court has held that "R.C.2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best interest factors in R.C. 2151.414(D)(1)(a) through (e). Consideration is all the statute requires." *In re A.M.*, 166 Ohio St.3d 127, 2020-Ohio-5102, 184 N.E.3d 1, ¶ 31. Moreover, this court has held that only one of the enumerated best-interest factors needs to be resolved in favor of the award of permanent custody. *In re L.W.*, 8th Dist. Cuyahoga No. 107708, 2019-Ohio-1343, ¶ 39, citing *In re Moore*, 8th Dist. Cuyahoga No. 76942, 2000 Ohio App. LEXIS 3958 (Aug. 31, 2000).

{¶ 54} Here, the juvenile court noted in its judgment entry that it considered the relevant factors of R.C. 2151.414(D)(1) and found permanent custody to be in the best interest of Children. The juvenile court further found that Children could not be placed with either parent within a reasonable time or should not be placed with either parent.

{¶ 55} Father now argues that clear and convincing evidence does not support a finding of any of the first four R.C. 2151.414(D)(1) factors. Father's brief does not address R.C. 2151.414(D)(2). CCDCFS asserts that sufficient evidence was presented to support a finding that permanent custody was in the best interest of Children pursuant to the factors set forth in both R.C. 2151.414(D)(1) and 2151.414(D)(2).

{¶ 56} We begin by reviewing the first best-interest factor set forth in R.C. 2151.414(D)(1): in this case, the interaction and interrelationship of Children to Father, each other, and their foster parents. The record demonstrates that while Children have a bond with and love for Father, there are ongoing apprehensions regarding his abilities to parent Children, properly address concerning behaviors, and ensure school attendance. There are also concerns of physical and sexual abuse while in Father's care, whether such instances occurred at the hand of Father or a caregiver with whom he entrusted Children. The record further demonstrates that Children's interactions with each other were volatile when placed together; Children exhibited aggressive and sexualized behavior with one another from tender years and benefited from placement in separate foster homes with opportunities to visit one another. Lastly, the record demonstrates that Children bonded with their foster parents and "[e]verything seems to be going quite well in both [adoptive foster] homes." (May 11, 2022, tr. 103.) Children's behaviors and school performance have also improved. Therefore, the record clearly and convincingly establishes the first best-interest factor in favor of permanent custody.

{¶ 57} Next, we consider the second best-interest factor, which concerns Children's wishes or GAL's recommendations. In the instant case, the court received an oral and written report from the GAL recommending that permanent custody to CCDCFS would be in Children's best interest. This finding is supported by clear and convincing evidence in the record. While testimony was offered that Children wish to be placed with Father, GAL expressed that "[d]ue to their age, I do not believe they have the ability to determine what is in their best interest." (GAL Report, Jan. 12, 2022.) And although GAL recognized Children's bond with Father and love for their parents, he too was concerned about Father's ability to "control these children for an extended period of time." (GAL Report, Jan. 12, 2022.) GAL further noted, "Both children are having their medical and educational needs met by the foster parents." (GAL Report, Jan. 12, 2022.) In both GAL's report and his trial testimony, he emphasized the importance of permanency in Children's lives and ultimately opined that permanent custody was in Children's best interest. Therefore, a finding of the second best-interest factor in favor of permanent custody is supported by the record.

{¶ 58} The third best-interest factor concerns Children's custodial history. The trial court found that Children were in the temporary custody of CCDCFS for 12 or more months of a consecutive 22-month period. As established above, the record demonstrates that Children have a long history with CCDCFS. Legal custody of Children was previously awarded to Legal Custodian in July 2017. Children were again referred to CCDCFS sometime thereafter and predispositional temporary

custody was granted to CCDCFS in October 2019. Moreover, it is undisputed that Children have been in the temporary custody of CCDCFS since January 3, 2020. Therefore, clear and convincing evidence supports a finding of the third best-interest factor in favor of permanent custody.

{¶ 59} The fourth best-interest factor involves Children's need for a legally secure permanent placement and whether such a placement could be achieved without a grant of permanent custody to CCDCFS. The record reveals that Children have been placed multiple times: with Legal Custodian, with Father, and with various foster homes either together or separate. As established above, the record clearly demonstrates that Children have behavioral needs, service needs, and an overriding need for permanency. As to whether permanent placement could be achieved without a grant of permanent custody to CCDCFS, the trial court found that reasonable efforts were made to prevent the removal of Children and finalize the permanency plan of reunification; however services provided to Children's mother and Father were unsuccessful. The court also found that Legal Custodian did not wish to be reunited with Children. The record clearly and convincingly supports these findings. Notably, the record reveals significant ongoing concerns regarding Father's substance use and parenting skills even after his completion of parenting and substance abuse programs. The record also reveals that Children's previous placement with Father was unsuccessful due to concerns of physical abuse, sexual abuse, and excessive absences from school. Therefore, legally secure

permanent placement, which Children need, could not be accomplished absent an award of permanent custody to CCDCFS.

{¶ 60} Based on the foregoing, we disagree with Father's arguments and find there is clear and convincing evidence in the record to support any of the best-interest factors set forth in R.C. 2151.414(D)(1)(a)-(d). Because only one of the R.C. 2151.414(D)(1) factors needs to be resolved in favor of the award of permanent custody, and Father did not raise the fifth factor, R.C. 2151.414(D)(1)(e), on appeal, we need not address it. Nor do we need to consider R.C. 2151.414(D)(2). *In re R.D.*, 8th Dist. Cuyahoga No. 111798, 2022-Ohio-4519, ¶ 51, citing *In re J.P.*, 10th Dist. Franklin No. 18AP-834, 2019-Ohio-1619, ¶ 39-40 ("R.C. 2151.414(D)(1) and 2151.414(D)(2) are 'alternative means' for determining whether permanent custody is in a child's best interest.") Accordingly, we find that the court did not abuse its discretion in determining that permanent custody was in the best interest of Children.

{¶ 61} We, therefore, hold that the record clearly and convincingly supports the juvenile court's judgment granting permanent custody of Children to CCDCFS and Father's single assignment of error is overruled.

### III. Conclusion

{¶ 62} The juvenile court's findings and its judgment granting permanent custody of Children to CCDCFS are supported by clear and convincing evidence in the record.

{¶ 63} Accordingly, judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

EILEEN A. GALLAGHER, P.J., and
MARY EILEEN KILBANE, J., CONCUR